In re ASSOCIATED GAS & ELECTRIC CO.

In re ASSOCIATED GAS & ELECTRIC CORPORATION.

District Court S.D. New York.

Aug. 25, 1944.

See also, D.C., 53 F.Supp. 118.

Lewis M. Dabney, Jr., of New York City, special counsel for Trustee of Associated Gas & Electric Co.

Allen E. Throop, of New York City (O. John Rogge, William W. Golub, and Carlos L. Israels, all of New York City, of coun- sel), for Trustees of Associated Gas & Electric Corporation.

Morton E. Yohalem, of Philadelphia, Pa., for Securities and Exchange Commission.

Jack Lewis Kraus, II, of New York City (Harry B. Kurzrok, of New York City, of counsel), for General Protective Committee.

Scribner & Miller, of New York City (Roscoe Pound, of Cambridge, Mass., and Charles E. Scribner and Frank R. Bruce, both of New York City, of counsel), for Committee of Agecorp 73s.

Ralph Montgomery Arkush, of New York City, for Agecorp 1978 Debentureholders Committee.

Hays, Wolf Schwabacher, Sklar & Epstein, of New York City (Ralph Wolf and Nathaniel Whitehorn, both of New York City, of counsel), for Protective Committee for Holders of Agecorp 8% Eight Year Gold Bonds due March 15, 1940.

Davies, Auerbach, Cornell & Hardy, of New York City (H. C. McCollom, of New York City, of counsel), for Jacobs Committee for CDCs.

Boehm & Fischman, of New York City (Louis Boehm and Bernard D. Fischman, both of New York City, of counsel), for Scrip Holders Protective Committee of Ageco.

Abraham Mitnovetz, of New York City, for Elias Protective Committee for Holders of Associated Gas & Electric Company Convertible Obligations Due 2002.

Nathan D. Shapiro, of Brooklyn, N. Y., for Kelby Protective Committee.

Joseph Nemerov and Leo B. Mittelman, both of New York City, for Baker Committee.

Frederick L. Kane, of New York City, for Pension Trustees.

William Roberts, of New York City for Equitable Life Assurance Society of the United States.

Glass & Lynch, of New York City (Joseph Glass, Leslie Kirsch, and Samuel Bader, all of New York City, of Counsel), for Empire Trust Co., as Indenture Trustee for Agecorp 73s.

Cullen & Dykman, of Brooklyn, N. Y. (Ralph W. Crolly, of Brooklyn, N. Y., of counsel), for Brooklyn Trust Co., successor Trustee for Agecorp 1978 Debentures.

Kelsey, Waldrop & Spalding, of New York City (H. Boardman Spalding, of New York City, of counsel), for Colonial Trust

Co., Successor Indenture Trustee of the SFIDs of 1983 and 1986.

Breed, Abbott & Morgan, of New York City, (Lloyd V. Almirall, of New York City, of counsel), for Underwriters Trust Co., Successor Indenture Trustee.

Rathbone, Perry, Kelley & Drye, of New York City (Hersey Egginton, Frank H. Heiss, and Frederick W. Doolittle, all of New York City, of counsel), for Central Hanover Bank & Trust Co., Indenture Trustee.

Humes, Buck, Smith & Stowell, of New York City (Irwin L. Tappen, of New York City, of counsel), for New York Trust Co., Trustee.

Egginton, Groehl & Denner, of New York City (Hersey B. Egginton and Lorimer Denner, both of New York City, of counsel), for Henry A. Stix.

Sparta Fritz, Jr., pro se.

LEIBELL, District Judge.

There are two matters before me for decision, both of which represent long strides towards the goal of these proceedings, the reorganization of Associated Gas and Electric Company (Ageco) and Associated Gas and Electric Corporation (Agecorp). One matter brings up for review the Special Master's report on a proposed compromise of what has become known as the Recap Litigation and of certain claims in the CDC (Convertible Debenture Certificates) proceeding; the other presents for Court approval, pursuant to Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., a joint plan for the reorganization of the Debtors. The distribution of securities provided for in the Plan is in precise accordance with the terms of the Compromise. The Securities and Exchange Commission has approved the Plan as fair, equitable and feasible, subject to certain conditions. Of necessity, therefore, the Commission has also approved the substance of the Compromise. I agree with its conclusions.

In the Recap Litigation the Trustee of Ageco, a committee for the Ageco Fixed Interest Debentures (FIDs) and certain of the FID holders themselves laid claim to certain assets held by Agecorp and to a first lien thereon, or to at least an equal pro rata participation therein with the holders of Agecorp's securities consisting of Agecorp 8s of 40, Agecorp 73s and Agecorp 78s.

These assets, in the main were formerly properties of Ageco. The claims were opposed by the Agecorp Trustees and by Committees and indenture trustees for Agecorp security holders.

The Recap Litigation takes its name from a "Plan of Debt Rearrangement and Recapitalization" (commonly referred to. as the Recap Plan) which the Hopson management proposed to the security holders of Ageco in May of 1933. The questions presented in the Recap Litigation involve not only the legality of the Recap Plan, Agecorp's title to its principal assets and the respective rights of Ageco security holders and of Agecorp's 73s and 78s in and to those assets, but also the claimed priority of the Agecorp 8% Gold Bonds due 1940 (8s of 40), issued in March 1932.

Under the Recap Plan the holders of Ageco fixed interested debentures (FIDs), then aggregating $265,000,000, were offered three optional exchanges for their holdings:

(a) Under Option 1, Agecorp Convertible Debentures due 1973 could be obtained in half the principal amount, and bearing the same fixed interest rate, as the Ageco debentures exchanged;

(b) Under Option 2, Agecorp Income Debentures due 1978 could be obtained in the same principal amount as the Ageco debentures exchanged but bearing a lower interest rate payable only if earned; or

(c) Under Option 3, Ageco Sinking Fund Income Debentures due 1983 could be obtained in the same principal amount, and with the same interest rate as the Ageco debentures exchanged. Interest on the SFIDs was payable unconditionally only so long as any Ageco debentures were not deposited under the Recap Plan, and so long as interest on the latter was paid or provided for. After all the Ageco debentures were deposited, interest on the SFIDs was payable only out of "available net income" as therein defined.

The Recap Plan provided that no more than $50,000,000 principal amount of Agecorp 73s would be issued under Option 1, and that the option could be closed as soon as $100,000,000 of Ageco Debentures had been deposited thereunder. Option 1 was declared closed January 17, 1934; but holders of the 73s were given the right to convert their 73s into twice their principal amount of 78s, at any time between June 15, 1935 and June 15, 1945.

Option 2 of the Recap Plan was declared closed April 7, 1936 but the plan provided that it could be reopened at any time. On November 1, 1936, Option 3 was modified by substituting the SFIDs due 1986 for the SFIDs due 1983. These securities were substantially identical, except that the SFIDs due 1986 bore a higher rate of interest than the 1983s under certain specified conditions.

There are presently outstanding in the hands of the public about $8,000,000 of Agecorp 8s of 40; $24,000,000 of the Agecorp 73s (issued under Option 1 of the Recap Plan); $134,000,000 of Agecorp 78s (issued under Option 2 of the Recap Plan or in exchange for 73s); $59,000,000 of unexchanged Ageco FIDs; $8,000,000 of Ageco SFIDs (issued under Option 3 of the Recap Plan); and some $140,000,000 in par or stated value of other securities of Ageco.

■ A compromise of the rival claims of Ageco and Agecorp security holders to the former Ageco properties which are now held by Agecorp, was recommended by the Trustees of both debtor estates. The Special Master, former Judge Frederick E. Crane of the New York Court of Appeals, who was also Special Master in the Recap Litigation, has reported in favor of the Compromise. The Compromise would grant parity to the Ageco FIDs with the Agecorp 73s and 78s, in the assets now held by Agecorp, and would allow in addition a so-called "differential," in favor of the 73s and 78s, for "lost interest" and for an assumed advantageous litigating position. The Master found (Findings of Fact Nos. 3 and 4) that the assets held by Agecorp as of May 1, 1943, did not exceed $125,000,000 in value and that if the existing capitalization and asset positions of Agecorp were recognized none of the security holders of Ageco would be entitled to share in the Agecorp assets. But the Master also found that there were sound reasons to support the Ageco creditors' attack on both Agecorp's capitalization and its asset position and he approved the Compromise. I adopt the report of the Special Master with some slight modifications of several Findings, and I approve the Compromise, upon the express condition that a Plan of Reorganization incorporating the Compromise is accepted by the participating security holders and confirmed by the Courts.

Under the Compromise, the Agecorp 8% Bonds due 1940 (the 8s of 40) are given a priority in the surviving company, and are rated in the Compromise at 102.56 for each old $100.00 bond, together with interest on each old $100.00 bond, at 4% from July 10, 1943 to the effective date of the Plan of Reorganization. The Compromise does not specify how the priority of the 8s of 40 shall be represented in the surviving company. This I believe was a prudent provision and left some leeway for those who were to draft a Plan of Reorganization to provide for the 8s of 40 a priority that would fit into the Plan as a whole. The terms of participation in the assets accorded the holders of 8s of 40 under the Plan of Reorganization provide that the new debentures to be issued to the 8s of 40 shall contain certain conversion rights. This will make them acceptable to the 8s of 40 Committee, who objected to the treatment accorded them under the Compromise proposal. So the Committee of the 8s of 40, while opposing the Compromise arrangement, are satisfied with the provisions of the Plan of Reorganization and support the Plan. I see no conflict between the Compromise and the Plan in respect to the 8s of 40.

The Plan of Reorganization in addition to giving effect to the Compromise, contains other provisions in conformity with the Bankruptcy Act and the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq.

■ It has been recognized that a plan of reorganization may adjust competing claims to priority in certain assets of the debtor in the possession of the Court. In Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 130, 60 S.Ct. 1, 14, 84 L.Ed. 110, Mr. Justice Douglas wrote:

"There frequently will be situations involving conflicting claims to specific assets which may in the discretion of the court, be more wisely settled by compromise rather than by litigation. Thus, ambiguities in the wording of two indentures may make plausible the claim of one class of creditors to an exclusive or prior right to certain assets as against the other class in spite of the fact that the latter's claim flows from a first mortgage. Close questions of interpretations of after-acquired property clauses in mortgages, preferences in stock certificates, divisional mortgages and the like will give rise to honest doubts as to which security holders have first claim to certain assets. Settlement of such conflicting claims to the res in the possession

of the court is a normal part of the process of reorganization. In sanctioning such settlements the court is not bowing to nuisance claims; it is administering the proceedings in an economical and practical manner."

A Plan of Reorganization, under former § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, which embodied a compromise of a claim was before the United States Supreme Court in Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669. See, also, Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 523, 61 S.Ct. 675, 85 L.Ed. 982; Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523, 565, 63 S.Ct. 727, 87 L.Ed. 959.

A reference to the history of the two debtor corporations, the proceedings for their reorganization and some of the litigation therein, seems appropriate at this point, before discussing the issues presented by the Special Master's report on the Compromise of the Recap Litigation, and the provisions of the joint Plan of Reorganization which has been approved by the Securities and Exchange Commission.

On January 10, 1940, the above named debtors, Ageco and Agecorp, filed voluntary petitions for their reorganization under Chapter X of the Bankruptcy Act in the United States District Court for the Northern District of New York. In its petition Ageco admitted its inability to pay its fixed charges, maturing interest, current expenses and taxes. Agecorp admitted its inability to pay its $8,000,000 of 8% bonds, which would mature on March 15, 1940, and its inability to pay interest from time to time on its outstanding debentures, which included about $25,000,000 due in 1973 and about $144,000,000 due in 1978.

Orders approving the voluntary petitions for reorganization were signed January 10, 1940. The proceedings were transferred to this Southern District of New York to suit the convenience of creditors and parties, early in February 1940. On March 2, 1940, I appointed Walter H. Pollak, Trustee of Ageco, and Denis J. Driscoll and Willard L. Thorp, Trustees of Agecorp. On October 2, 1940, Mr. Pollak died. On October 16, 1940, I named his counsel, Stanley Clarke, as Trustee of Ageco.

The voluntary petition of the debtor Agecorp filed January 10, 1940, gives some idea of the size of the "Associated System" (see par. 4):

"The nature of the business of the Debtor is that of a public utility holding company. It is a registered holding company under the Public Utility Holding Company Act of 1935 (hereinafter referred to as the 'Holding Company Act').

"The Debtor is the direct and only direct subsidiary of the Associated Company, which is also a registered holding company under said Act. The Associated Company owns 100% of the outstanding capital stock of the Debtor consisting of 671,000 shares of Common Stock, and also $73,419,797.27 principal amount (as of September 30, 1939) of debentures and notes receivable (hereinafter more particularly described) of the Debtor. Said shares of stock, debentures and notes receivable are carried on the balance sheet of the Associated Company at an aggregate of $364,061,442.27 as of September 30, 1939. They constitute substantially all of the assets of the Associated Company.

"The Debtor has seven direct subsidiaries, four of which are also registered holding companies, namely General Gas & Electric Corporation, Associated Electric Company, NY PA NJ Utilities Company, all of which are corporations of the State of Delaware, and Northeastern Water Companies, Inc., a corporation of the State of New York. The remaining three direct subsidiaries of the Debtor, which are not registered holding companies, are Associated Utilities Corporation, The United Coach Company and The Associated Corporation, all corporations of the State of Delaware.

"In addition to its said seven direct subsidiaries, the Debtor has indirect subsidiaries, consisting approximately of (as of November 30, 1939) seventy public utility companies (as the term 'public utility company' is defined in the Holding Company Act), forty-two water companies, fifteen transportation companies, two ice companies and twenty-six miscellaneous companies.

"The subsidiaries of the Debtor render service in territory having a population estimated to be in excess of 7,000,000, to approximately 1,762,000 customers in more than 6,200 communities. The consolidated gross operating revenues of the Debtor and its subsidiaries for the twelve months ended

September 30, 1939, amounted to $133,674,-409.49. Over 76% (viz., 76.89%) of such revenues were derived from operating properties located in the Middle Atlantic States, namely, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia and West Virginia."

The Ageco corporate balance sheet annexed to the petition for reorganization stated the assets of the debtor, as of September 30, 1939, at approximately $372,-000,000, consisting for the most part of its investment in Agecorp. Its obligations to creditors (including approximately $50,-000,000 of obligations convertible into stock at Ageco's option) aggregated approximately $140,000,000. The value of its capital and surplus was stated to be about $232,000,000.

The Agecorp corporate balance sheet attached to its petition for reorganization stated the assets of Agecorp as of September 30, 1939, at $445,000,000 of which $437,-000,000 represented investments in subsidiary companies. Its publicly held securities were shown as $178,129,605—and miscellaneous obligations as approximately $11,000,000. The balance of its capitalization was listed as held by Ageco.

### The Recap Litigation.

In the administration of the two estates it soon developed that the book value of Agecorp's interest in various subsidiaries was greatly over-stated and that it was considerably less than the total of Agecorp's long term debt.

Upwards of $59,000,000 of Ageco FIDs had not made the exchange under the Recap Plan. The Committee of unexchanged FIDs and the Trustee of Ageco asserted that the Hopson Recapitalization Plan of May 1933 was based on transactions that were in violation of the terms of the indentures under which the Ageco FID debentures had been issued; that the Recap Plan was the result of transactions between two corporations subject to the control of one man Hopson; that all of the directors of Agecorp were also directors of Ageco and were under Hopson's domination; and that the Recap Plan was a fraud which, together with the transactions leading up to it, should be undone by the exercise of this Court's equitable powers.

The Ageco Trustee, the General Committee of Ageco FIDs and certain debenture holders set forth their claims to the Agecorp assets in petitions filed in the Age-corp Chapter X proceeding, to which the Agecorp Trustees and Committees of Agecorp security holders made answer and objection. The proceeding became known as the Recap Litigation. The issues were referred to the Hon. Frederick E. Crane, as Special Master on July 26, 1941. The Recap Litigation "sought adjudication of the following matters, among others:

"(a) The right, title, lien, and interest of the Ageco Trustee in and to the assets held by the Agecorp Trustees.

"(b) The right of some or all of the unsubordinated security holders and other creditors of Ageco to share in the Agecorp assets on a parity, or better than equally, with some or all of the Agecorp security holders and other creditors."

About the middle of September, 1942, the hearings before the Special Master had been completed; 12,000 pages of testimony had been taken in 133 sessions and over 700 exhibits had been offered or received in evidence.

### Compromise of the Recap Litigation.

While the hearings in the Recap Litigation were proceeding before Judge Crane in May of 1942, a committee was named by the various classes of Ageco and Agecorp security holders to see if a fair compromise of the Recap Litigation could be devised. The members of the committee were Stanley Clarke, Trustee of Ageco, and Willard L. Thorp, one of the Trustees of Agecorp. Mr. Yohalem, the counsel for the Securities and Exchange Commission, sat in as an unofficial observer at the request of the trustees. The terms of a proposed Compromise of the Recap Litigation and related issues were submitted by the trustee-committee in November 1942. The question of the fairness of the proposed Compromise was also referred to Judge Crane, as Special Master, on November 13, 1942. Copies of the proposed Compromise Agreement, and notice of the hearings to be held thereon, were mailed to all known security holders of Ageco and Agecorp. Extended hearings on the Compromise were held by the Special Master, and on September 3, 1943, he filed his report herein, with findings of fact and conclusions of law. He approved the proposed Compromise as fair and equitable. As he states in Finding No. 13 "The proposed compromise encompasses all the controversies involved in the Recap Litigation and the issues in the CDC Litigation relating to the holders of CDCs and

Original Holders of COs and Preferred Stocks." It also affords participation for persons who establish their right to be treated as unsubordinated creditors of either the Ageco or Agecorp estate. Their claims in a comparatively small amount, were referred by me to a Referee in Bankruptcy for determination in June 1943.

The Special Master's report on the proposed Compromise came on for a hearing before me on October 8, 1943, and it was then urged that I should postpone a consideration of the Report until the Securities and Exchange Commission had passed upon a joint Plan of Reorganization of Ageco and Agecorp, which had been filed with the Commission on June 14, 1943 under Section 11 (subd. f) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(f). The latter section provides that "in any such proceeding (i. e. in a court of the United States, whether under this section or otherwise) a reorganization plan for a registered holding company or any subsidiary company thereof shall not become effective unless such plan shall have been approved by the Commission after opportunity for hearing prior to its submission to the court." Both Ageco and Agecorp were registered public utility holding companies. The proposed Compromise of the Recap Litigation was the backbone of the joint Plan of Reorganization of Ageco and Agecorp.

In an opinion filed November 22, 1943 (In re Associated Gas & Electric Co., D.C., 53 F.Supp. 118, 124) I expressed the view "that the most expeditious and sensible procedure for the Court to follow would be to have the questions relating to the approval of the plan of compromise and the approval of the plan of reorganization argued and briefed by counsel at one and the same time, and that the Court then determine the issues thus presented."

I have made mention above of still another proceeding herein involving claims of certain security holders of Ageco, which were alleged to be subordinate to the fixed interest bonds of Ageco. This group of claims included those based on Ageco convertible debenture certificates, Ageco convertible obligations, and Ageco interest and non-interest bearing scrip. The branch of the litigation involving those claims became known as the CDC litigation. On October 27, 1942, I signed an order appointing Judge Crane, Special Master to pass upon those claims also. In the Master's report on the Compromise he refers to those securities in Finding No. 5 as follows:

"Ageco also has outstanding $3,808,477 principal amount of Convertible Debenture Certificates (hereinafter referred to as 'CDCs'); and an estimated $20,000,000 principal amount of Convertible Obligations Due 2002 and an estimated 17,500 shares of Preferred Stock and Preference Stock (hereinafter collectively referred to as 'Original Holders of COs and Preferred Stocks'), held in each instance by persons who originally obtained their securities on exchanges for CDCs, or by persons who are the personal representatives, legatees, distributees, or statutory successors of such original holders."

The Special Master rendered his report on the CDC litigation on March 30, 1943. It is incorporated by reference in Finding No. 10 of his report on the Compromise of the Recap Litigation.

In an opinion filed July 30, 1943 (In re Associated Gas & Electric Co., D.C., 53 F. Supp. 107) I approved the Special Master's report on the CDC litigation in so far as it related to securities that would not participate in the assets distributable under the proposed Compromise of the Recap Litigation. As to the other securities in the CDC litigation, which would participate in the assets under the proposed Compromise of the Recap Litigation, I took no action, because I felt that to do so "might upset the fundamental basis of the settlement, which recognizes that there are two sides to the questions presented." Certain of the security holders who would not participate under the plan of compromise and who were declared subordinate to the fixed interest debentures of Ageco, took an appeal to the Circuit Court of Appeals, Second Circuit, and that Court approved the ruling made in respect to the excluded securities. It suggested in a dictum that certain original holders of scrip who still retained their scrip might be in the same position as the original holders of COABs, taken in exchange for CDCs. Elias v. Clarke, as Trustee of Ageco, et al., 2 Cir., 143 F.2d 640. The Trustees stated at the hearings before me that the claims of these original scrip holders were considered at the time the terms of the proposed compromise were being drafted and that for good and sufficient reasons they were granted no participation. I have accordingly made a supplemental finding of fact, No. 13A, to be added to the Special Master's findings as follows:

"13A. In arriving at the provisions to be made in the Recap Compromise for Original Holders of COs, the Ageco Trustee and the Agecorp Trustees gave consideration to the fact that some of those Original Holders still retain the unsubordinated scrip and the subordinated IB and NIB Scrip issued as interest on their COs, while others have parted with some or all of such scrip. The Trustees decided that, on both legal and practical grounds, all Original Holders of COs should be treated on the same basis even though some of them no longer hold all the scrip they had received. The Trustees again considered this question after the Special Master had filed his report in the CDC Litigation, and adhered to their original conclusion. Further consideration was given to the matter after the Circuit Court of Appeals handed down its decision in Elias v. Clarke, 2 Cir., 143 F.2d 640, and the Trustees concluded that no change should be made in the provisions of either the Recap Compromise or the Plan, relating to Original Holders of COs."

### Joint Plan of Reorganization for Ageco and Agecorp.

The Trustees of Ageco and Agecorp submitted to the Securities and Exchange Commission on June 14, 1943, a Plan of Reorganization for both debtors. A number of hearings were had before one of the Commission's examiners. The entire record made before Judge Crane in the Recap Litigation was received by the Examiner. He also received evidence as to the value of the assets of Ageco and Agecorp. Later the issues presented were argued before the entire Commission and after due deliberation the Commission filed its findings and opinion. The Commission entered an order, dated April 14, 1944, approving the Plan of Reorganization for Ageco and Agecorp submitted by the Trustees, with certain minor amendments and subject to certain specified terms and conditions. The opinion of the Commission covers 60 pages. Annexed to it are schedules and financial statements, one of which, Exhibit B, sets forth the "Outstanding Securities and Liabilities of Ageco and Agecorp as at March 31, 1943, and Proposed Distribution of New Common Stock of Surviving Company." Other schedules state the assets and earnings of various subsidiaries in the Associated System. The Commission found the Plan of Reorganization to be fair, equitable and feasible. The entire record before the Commission has been certified to this Court for use at the Court's hearings on the Plan of Reorganization.

Through a notice dated May 1st, 1944, the security holders and creditors of Ageco and Agecorp [1] were informed that the Securities and Exchange Commission had approved the Plan of Reorganization, a copy of which was annexed to the notice, and that a hearing on the question of approving the Plan would be held by this District Court on June 12, 1944. Section 174 of the Bankruptcy Act, 11 U.S.C.A. § 574. In a letter to the security holders, the Trustees referred to the Recap Litigation and explained that the Plan of Reorganization is based on a proposed compromise of that litigation. I quote the following from the trustees' letter:

"The assets of Agecorp are substantially all the assets to which the creditors of both Ageco and Agecorp must look. Agecorp's assets consist, for the most part, of stock and other investments in subholding companies, the most important of which are NY PA NJ Utilities Company, Associated Electric Company, and General Gas & Electric Corporation. These companies in turn are not operating companies; their assets consist chiefly of securities of subsidiary operating utility companies. The three subholding companies and their subsidiary companies have large amounts of indebtedness and preferred stock outstanding in the hands of the public. The interest of Ageco and Agecorp in their subsidiary companies, being chiefly a common stock interest, is generally subordinate to this outstanding indebtedness and preferred stock.

"The assets that are available for creditors of Ageco and Agecorp thus consist principally of junior securities and other investments. In the opinion of the Trustees

---

[1] There are approximately 18,000 holders of Agecorp 8s of 40; 16,000 holders of Agecorp 73s; 54,000 holders of Agecorp 78s; 37,000 holders of Ageco FIDs; 3,000 holders of SFIDs and 6,700 holders of CDCs. When to these were added the thousands of holders of junior securities and stock of Ageco, the total number of security holders and creditors to whom notice of these hearings was given reached the staggering figure of 226,876. The notices and copies of the Plan sent to them through the mails weighed over 12 tons. Fewer than 40 persons appeared in Court. About the same number, mostly Ageco stockholders, wrote letters opposing the Plan.

these assets are worth substantially less than the amount required to satisfy the claims of the holders of Debentures and other senior indebtedness of Ageco and Agecorp, which amount to approximately $250,000,000. Since these claims have priority, nothing will be left for holders of stock and other securities that are subordinate to general creditors."

The Plan of Reorganization of Ageco and Agecorp is summarized in the notice as follows:

"Summary of the Plan.

"The Plan provides that the assets of Ageco and Agecorp will be taken over by one Surviving Company.

"The securities of the Surviving Company, estimated to be outstanding on the consummation of the Plan, will be as follows:

New Senior Debt—5 year bank loan... $7,500,000
New Debentures 4¼%, 10 year.......... 7,400,000
New Common Stock.................... 7,500,000 shs.

"The New Senior Debt will be issued for cash necessary to be used in connection with the Plan and the Nypanj Reconstruction Program (see page 4), and for the payment of tax claims, expenses and other nonrecurring costs (including cash adjustments on retirement of Agecorp 8% Bonds due 1940), and allowances to be made by the Court.

"Holders of Agecorp's 8% Bonds due 1940 will receive New Debentures in the amounts provided in the Plan (see page 7). These New Debentures will be junior to the $7,500,000 New Senior Debt but senior to the New Common Stock. They will bear interest at 4¼% per annum and mature in 10 years. These New Debentures will be convertible, at the holders' option only, into New Common Stock of the Surviving Company. The conversion rate, expressed in the Plan, is reasonably geared to the probable initial market value of the New Common Stock The Trustees believe that these New Debentures will be worth at least par.

"All other participating creditors of Ageco and Agecorp will receive New Common Stock of the Surviving Company in the amounts set forth in the Plan (see page 7). The value of the New Common Stock is, of course, a difficult thing to estimate. However, subject to the $7,500,000 New Senior Debt (which will bring in a corresponding amount of cash), the $7,400,000 of New Debentures and minor amounts of current liabilities, the New Common Stock will represent the entire value of all the assets of the Estates.

"The creditors who will receive New Common Stock, in the amounts set forth in the Plan (see page 7), are the holders of the following securities and claims:

"*Agecorp:*

"Debentures due 1973 and 1978.

"*Ageco:*

"Debentures due 1948, 1949, 1950, 1958, 1965, 1968, 1977, 1983 and 1986.

"Convertible Investment Certificates extended to 1943, 5½% and 6%.

"Convertible Debenture Certificates, Series A to E, Series B and C (Manila), Series B of 1929 and 1931 Series.

"Convertible Debenture Obligations, Series F.

"Convertible Obligations, due 2002, Series A and B, 6%, 6½%, 7%, provided such Convertible Obligation was acquired by the present holder in exchange for an Ageco Convertible Debenture Certificate or Convertible Debenture Obligation.

"Preferred Stock ($6, $6.50, $7 Dividend Series) and $6 Cumulative Preference Stock, provided such Preferred Stock or Preference Stock was acquired by the present holder in exchange for an Ageco Convertible Debenture Certificate or Convertible Debenture Obligation.

"*Ageco and Agecorp:*

"General claims to the extent allowed by the Court, including non-security claims, fraud claims, and claims on securities matured before January 10, 1940 to the extent they have not been paid, such as interest coupons and checks payable before January 10, 1940, Ageco Scrip due 1937 or 1938, and Ageco Convertible Investment Certificates due 1938.

"Holders of the following Ageco securities get nothing under the Plan:

"Convertible Obligations, due 2002, Series A and B, unless such Convertible Obligation was acquired by the present holder in exchange for an Ageco Convertible Debenture Certificate or Convertible Debenture Obligation.

"Convertible Obligations without fixed maturity.

"Preferred Stock and Preference Stock, all series, unless such Preferred Stock or Preference Stock was acquired by the present holder in exchange for an Ageco Convertible Debenture Certificate or Convertible Debenture Obligation.

"Interest Bearing and Non-Interest Bearing Scrip, due 1941, 1942, 1944 and 1947.

"Convertible Certificates.

"Common Stock.

"Class A Stock.

"Class B Stock.

"Stock Purchase Warrants.

"The reason these securities got nothing under the Plan is that they are all subordinate to general creditors and, as believed by the Trustees and found by the Securities and Exchange Commission, the value of the assets of the Estates is far below the amount that would be needed to satisfy the claims of the general creditors."

The principal amount of Ageco and Agecorp securities, outstanding as of March 31, 1943 (excluding certain securities which are treasury holdings or held by wholly owned subsidiaries of Agecorp in which there is no public interest, and holdings under an escrow agreement of May 15, 1933, and certain holdings of debt held by Ageco and Agecorp, and securities to be surrendered under the UESCO agreement) were listed by the Securities and Exchange Commission on page 21 of its opinion as follows:

| | Principal Amount Outstanding March 31, 1943 |
|---|---|
| Agecorp: | |
| 8% Eight Year Bonds (8's of '40) | $ 8,037,510 |
| Convertible Debentures (73's) | 24,244,765 |
| Income Debentures (78's) | 134,598,755 |
| Total Agecorp securities | $166,881,030 |
| Ageco: | |
| Fixed Interest Debentures (FIDs) | $ 58,853,831 |
| Income Debentures due 1983 | 12,000 |
| Sinking Fund Income Debentures (SFIDs) due 1983 | 1,217,630 |
| Sinking Fund Income Debentures (SFIDs) due 1986 | 6,049,410 |
| Convertible Obligations due 2002 (COs) | 42,089,844 |
| Scrip matured or maturing after 1/10/40 | 10,199,781 |
| Total Ageco debt securities | $118,422,496 |
| Preferred Stocks (at liquidating preferences) | $ 49,282,423 |
| Preference Stocks (at liquidating preferences) | 76,926,830 |
| Class A Stock ($1 par) | 4,437,354 |
| Class B Stock ($1 par) | 607,953 |
| Common Stock ($1 par) | 1,085,549 |
| Total Ageco stocks | $132,310,109 |
| Total Ageco securities | $250,762,605 |
| Total Agecorp and Ageco securities | $417,643,635 |

[The outstanding Agecorp convertible debentures of 1973, in the sum of $24,244,765, under the Compromise and the Plan of Reorganization, would be rated at double that principal amount, because they were originally Ageco FIDs in twice their present amount.]

The Special Master summarized the proposed Compromise in Finding No. 14, as follows:

"14. Under the proposed compromise, the claims of holders of 8s of '40 are settled by the allowance to them of claims, in the amounts set forth in paragraph I of Appendix A, which are to have priority over the claims allowed to other security holders and creditors of Ageco and Agecorp covered by the compromise. The claims of the other security holders of Ageco and Agecorp are settled by the allowance of claims, in the amounts set forth in paragraph II of Appendix A, which bear the following average percentage ratios to the claims allowed to holders of Ageco Debentures, taking the latter at 100%:

| Security | Percentage Ratio |
|---|---|
| 73s | 257.6% |
| 78s | 117.6% |
| Ageco Debentures | 100.0% |
| 5% Income Debentures due 1983 | 100.0% |
| SFIDs of '83 | 79.6% |
| SFIDs of '86 | 76.7% |
| CDCs | 40.4% |
| Original Holders of COs and Preferred Stocks | 20.2% |

"The claims allowed to the holders of the various series within each class of securities, vary to some extent because of the different dates at which interest was last paid on the securities and the different interest rates which the securities bear."

In paragraphs 6 to 8 of Article II of the joint Plan of Reorganization, the percentage ratios for the participating securities are set forth in terms of shares of new common stock of the surviving or resulting corporation.

The capitalization of the Surviving Corporation is described in Article I, paragraph 3 of the joint Plan of Reorganization:

"3. Capitalization of the Surviving Company. The capitalization of the Surviving Company shall be as follows:

| | Authorized | Estimated to be Outstanding on Consummation of the Plan |
|---|---|---|
| New Senior Debt | $ 8,000,000 | $7,500,000 |
| New Debentures | $ 8,000,000 | $7,400,000 |
| New Common Stock $5 Par Value | 10,000,000 shs. | 7,500,000 shs.* |

*Shares estimated to be distributable as hereinafter set forth to holders of Participating Securities and General Claims but not including shares which may become distributable to The Chase National Bank of the City of New York or upon conversion of New Debentures."

The new senior debt, the new debentures and the new common stock are explained in paragraph 4 of Article I:

"The New Senior Debt will be represented by a bank loan, to mature in five years, and to be amortized over said five-year period in approximately equal annual instalments. The New Senior Debt may be secured or unsecured. If the New Senior Debt is secured by a pledge of collateral, there will be appropriate provisions whereby a portion or portions of said collateral may be released from the pledge (a) on a sale by the Surviving Company of such portion of the collateral and application of the proceeds toward payment of the New Senior Debt, or (b) upon reduction of the New Senior Debt from time to time, provided that the sound value of the remaining collateral, as previously agreed upon, bears an agreed ratio to the unpaid balance of the New Senior Debt, or (c) upon the assumption by any other company of an appropriate portion of said New Senior Debt."

"The New Debentures (the terms and conditions of which are summarized in Exhibit A annexed hereto) shall be subordinate both as to principal and interest to not to exceed $15,000,000 principal amount of senior debt (including but not limited to the New Senior Debt). They shall not be secured by any pledge of collateral. The New Debentures shall be dated as of the effective date of the Plan and shall mature ten years after such date. They shall bear interest at the rate of 4¼% per annum, payable semi-annually. Provisions respecting convertibility into Common Stock at the holder's option and provisions respecting the terms upon which the New Debentures may be called for redemption are summarized in Exhibit A annexed hereto."

"The New Common Stock shall have a par value of Five Dollars ($5) per share and shall be entitled to one vote per share for all purposes, with the privilege of cumulative voting for the election of directors. Application will be made to list the New Common Stock on a national securities exchange."

"The excess of the book value of the assets of the Surviving Company as determined by the Board of Directors, over its liabilities and capital stock, shall be credited to capital surplus."

The Special Master's Report on the Compromise of the Recap Litigation and of Certain Claims in the CDC Proceeding.

In reviewing the Master's report approving the Compromise and in considering the provisions of the joint Plan of Reorganization for both debtors, already approved by the Securities and Exchange Commission, I must pass upon the basic question of the fairness of the Compromise, since the Plan gives effect to the Compromise. A determination of the fairness of the Compromise, in turn calls for the consideration of two main controversial questions—(1) Should the Ageco FIDs share equally, as to principal, with the Agecorp 73s and 78s in the assets standing in the name of Agecorp? (2) Does the differential (17.6% for the 78s and 57.6% for the 73s) adequately compensate the present holders of Agecorp 73s and 78s for the so-called "lost interest", that is the difference between the interest paid on an Agecorp 73 or 78 on the one hand compared with what the Ageco FIDs received by way of interest?

It seems appropriate at this point to refer to Findings of Fact of the Master, and several Findings of the Securities and Exchange Commission, which show the corporate history of the debtors and their wholly-owned subholding companies, the intercorporate dealings of Ageco and Agecorp, and their dealings through the medium of subholding companies of the Associated System. This will develop the transactions that preceded and led up to the submission by the Hopson management of the plan for the recapitalization of Ageco in May 1933. Almost $6,000,000 was spent in an attempt to persuade or frighten the Ageco FID holders into exercising one of the options of the Plan, under which they would become security holders of Agecorp at half their principal amount with fixed interest (Agecorp 73s), or at their

old principal amount but on an income-if-earned basis (Agecorp 78s).

Ageco was incorporated in New York on March 19, 1906. It was a comparatively small public utility holding company with gross consolidated assets in 1922 of $7,000,-000. Between March 14, 1922 and April 1923 Howard C. Hopson and John I. Mange acquired all of Ageco's outstanding shares of voting stock. Hopson and Mange held and exercised voting control of Ageco until January 10, 1940. Mange was the operating executive. Hopson controlled the financial and accounting policies of Ageco and its subsidiaries throughout. He controlled their Boards of Directors and held their undated signed resignations. Hopson's employees kept the minute books; some of the minutes were spurious. They also kept the books of account (irregularly maintained). Entries were changed and reinstated as Hopson directed; one item was changed 13 times. Alleged contracts for stock subscriptions of Ageco in subsidiaries, disappeared and reappeared as the occasion required. There were no corporate resolutions authorizing the transfer of the bulk of Ageco assets to AUICorp. The officers of Ageco and Agecorp were selected by Hopson and were paid through checks of Hopson "service companies" which furnished the corporations in the Associated System with "auditing, corporate, security, transfer, tax consultant and other services." For these services Hopson's personally-owned service companies were paid large sums by the companies in the Associated System, giving him and his family a profit in excess of $6,500,000 in the period of 1922 to 1938.

In 1922 Ageco controlled relatively few subsidiaries. In 1929 it controlled about 200 subsidiaries. The more subsidiaries in the Associated System, the more work for the Hopson service companies and the greater his personal profits. At December 31, 1929, the gross book value of the consolidated assets of the corporations in the Associated System had increased to $900,-491,542, largely as a result of the acquisition of voting stocks and other securities of other public utility holding company systems and of various operating utility companies. Of course, many of the operating companies had their own debt structures.

In Finding of Fact No. 25, the Special Master explains how this expansion took place.

"25. The expansion of the Associated System was financed in large part by funds realized from the issuance of Ageco securities, or by exchanges of Ageco securities for securities of other holding company systems and operating companies. Part of the increase in the consolidated assets of Ageco and its subsidiaries was financed through the issuance of securities by subholding and operating companies in the Associated System."

The different classes of Ageco fixed interest debentures and the amounts outstanding at various dates are listed in Finding of Fact No. 26. They totaled $232,-000,000 on December 31, 1931; $261,000,-000 on December 31, 1932 and $265,000,000 on May 15, 1933.

Ageco FIDs Issued After March 31, 1932.

It appears from the Special Master's Finding No. 26 that between December 31, 1931 and May 15, 1933 the amount of Ageco FIDs outstanding increased from 232 million to 265 million dollars. At the request of the attorney for the Committee of Agecorp 73s, the Trustees ascertained from Ageco's records that there had been an increase of $25,603,660 in Ageco FIDs outstanding between March 31, 1932, and April 30, 1933. I thought the record should show the purposes and the consideration for which these additional FIDs had been issued, in view of the contention of the attorneys for the Trustees and the attorney for the Committee of FIDs that about 95% of the increase represented exchanges of Ageco FIDs for other stocks and securities of system companies or of Ageco. The Trustees accordingly prepared two schedules (Exs. 33 and 33A) which, together with the testimony of a former Ageco accountant, definitely accounted for $23,531,-220 of these FIDs. Similar information as to the remaining $2,072,440 could not readily be obtained. I have made an additional Finding No. 26A to supplement the Special Master's Finding No. 26. The sales and exchanges referred to therein were made through Associated Corporation, a wholly-owned subsidiary of Ageco, which in effect was Ageco's agent in these transactions.

One startling item on Exhibit 33 (cash sales of the FIDs during that period), shows that $1,110,400 principal amount of FIDs was issued for $332,902.78 in cash, at about 30¢ on the dollar. This probably represented FIDs acquired by Associated

Corporation and resold at the above figure. It shows the value the management itself placed upon Ageco FIDs during part of that period. At the time the Recap Plan was offered May 15, 1933 the market price of the FIDs was down to about 19.

Pursuant to calls made by the Ageco management in February 1932, some $2,-351,610 of FID 5s of 1965 and 5s of 1968 were issued on and after the call date, June 30, 1932, for 76,647.54 $1.60 Interest Bearing Allotment Certificates (Ibacs); and by a further call made January 23, 1932 $7,096,560 of FID 5s of 1965 and 5s of 1968 were issued for 57,191.5958 $8 Ibacs on and after the call date of June 30, 1932. A comparatively small amount of cash accompanied these exchanges.

Further, $8,325,000 of FID 4½s of 1958 and $3,202,000 of FID 4s of 1983 were issued in exchange for $11,527,000 of Eastern Utilities Investing Corporation 5s of 1954. The EUIs were part of an issue sold in March 1929, of which Ageco had received the cash proceeds, giving EUICorp various Associated System securities. Between March 31, 1932 and May 15, 1933 EUI's assets were principally Preferred and Preference Stocks and COABs of Ageco, which had little or no value. The option extended the holders of EUIs to make the exchange for Ageco FIDs was, of course, readily accepted, even though the FIDs themselves were quoted at a comparatively low figure. It was better to own an Ageco FID than an EUI debenture. These exchanges of Ageco FIDs for other Ageco and Associated System securities also appear to have been a preliminary step to the Recap Plan, which was to be offered to the FIDs.

### Transfer of Ageco's Properties to Agecorp.

As Ageco acquired the shares of various holding companies and utility operating companies, the stock certificates were issued and kept in the name of a nominee, generally Day & Co., a Hopson controlled partnership. The ownership of the acquired stocks was entered on the books of such subholding companies as Hopson designated, and was transferred from one company to another as he directed. There gradually developed several principal wholly-owned subholding companies in the Associated System. These were—Associated Utilities Investing Corporation (AUICorp), Associated Properties, Inc. (Aprops), Associated General Electric Corporation (Associated General) and the New York Electric Company.

AUICorp was incorporated in Delaware June 7, 1922. It became Agecorp by a change of name February 25, 1932. Aprops was incorporated in Delaware on March 24, 1926. Its capital stock was owned by AUICorp until May 18, 1926, when it was transferred to Ageco. In March 1932 Aprops was merged into Agecorp. The capital stock of AUICorp (and Agecorp) has at all times been owned by Ageco.

Associated General was incorporated in Delaware August 13, 1927 as Associated Gas and Electric Company of Delaware. Its name was changed to Associated General Electric Corporation September 14, 1929. Its capital stock was owned by AUICorp until September 1929 when it was transferred to Ageco and was owned by Ageco to March 1931. In March 1931 all of the assets of Associated General were transferred to AUICorp which company then assumed all of the liabilities of Associated General.

The Special Master found:

"33. At all times from 1922 on, Ageco's assets consisted principally of voting stocks, other securities, and accounts and notes receivable, of subsidiary and affiliated holding companies. When securities of other holding company systems or operating companies were purchased, the practice was generally followed of vesting ownership at the time of acquisition in AUICorp, Aprops, Associated General Electric Corporation, or some other subholding company. Transfer of securities of subsidiary companies were frequently made from Ageco to subholding companies and from one subholding company to another. * * *"

"37. The vesting of ownership of securities in subholding companies, including AUICorp, Aprops, and Associated General Electric Corporation, was reflected on the books of account of Ageco and its subsidiaries by the recordation of open account transactions between Ageco and these companies. Advances to Aprops were carried on the books of Ageco as an account receivable through February, 1927, and as subscriptions to common stock of Aprops from that date through November, 1930. Advances to AUICorp were carried on the books of Ageco as an account receivable through January, 1928 and, from that date

through November, 1930, as subscriptions to common stock of AUICorp. Advances to Associated General Electric Corporation were carried on the books of Ageco as an account receivable from February, 1929 through May, 1929, and from that date through November, 1930, as subscriptions to the common stock of Associated General Electric Corporation. None of these companies had sufficient authorized stock, during these periods, to fill these subscriptions. These subscription accounts were originally placed on the books of account pursuant to instructions from Hopson."

The various wholly-owned subholding companies, on whose books the stocks purchased by Ageco were entered as owned by the subholding companies, were only "corporate pockets" of Ageco. The purchased properties were really owned by Ageco and had been acquired with Ageco funds or by the issuance of Ageco debentures and other securities. The Special Master found that "It was Hopson's policy to conceal from the public, in so far as possible, the precise location in the System of its investments." (Last sentence of Finding No. 34.)

The manner in which Ageco received "payment" for the assets which it put into these various corporate pockets, was also a matter of Hopson's orders and he changed the form of the credit as he saw fit. The Special Master's Findings of Fact Nos. 44 to 47 illustrate this:

"44. At November 30, 1929, the investments, accounts receivable, and notes receivable of Ageco totalled $557,823,149. Of this amount, $469,517,429 was represented by Ageco's investment, principally in the form of common stock and subscriptions thereto, in AUICorp, Aprops, Associated General Electric Corporation, and New York Electric Company (another subholding company). The investment in AUICorp consisted of $80,433,671 in common stock and subscriptions thereto, and $59,831 in an account receivable.

"45. As at December, 1929, according to its books of account, Ageco transferred its investment in New York Electric Company to AUICorp and received, in consideration for the transfer, $191,934,141 in subscriptions to the common stock of AUICorp, an amount equal to that at which the investment in New York Electric Company was then carried on the books of Ageco. There is an unresolved issue of fact, on which the evidence is in conflict, as to which this transaction took place in December, 1929, or at some later time before April, 1930.

"46. As at December 31, 1929, and during 1930, securities of Metropolitan Edison Company, New Jersey Power and Light Company, and Northern Pennsylvania Power Company, three of the major operating companies in the Associated System, were transferred to Metropolitan Edison Corporation, a subsidiary of AUICorp, by the subholding companies which had previously held the securities. These transactions resulted in an increase of $127,-999,610 in Ageco's subscriptions to the common stock of AUICorp.

"47. In December, 1930, according to its books of account, Ageco's subscriptions to the common stock of Aprops, AUICorp, and Associated General Electric Corporation were cancelled, and replaced by open accounts receivable in the same amounts, as follows:

| | |
|---|---|
| AUICorp | $378,520,533 |
| Aprops | 82,151,322 |
| Associated General Electric Corporation | 58,192,760 |
| Total | $518,864,615" |

Further manipulations of the Ageco investments are recited in the Master's Findings Nos. 49 to 52, and No. 54:

"49. In March, 1931, Associated General Electric Corporation transferred all of its assets to AUICorp, and AUICorp assumed all of the liabilities of Associated General Electric Corporation. The transfer was approved by the nominee referred to in Finding of Fact 35, [i.e. Day & Co.] which was the stockholder of record of Associated General Electric Corporation. As a result of this transaction, Ageco's open account receivable from AUICorp was increased by $59,821,792.

"50. In September, 1931, Ageco transferred certain miscellaneous investments to AUICorp and, in consideration for the transfer, its open account receivable from AUICorp was increased by $55,463,370.

"51. On February 25, 1932 AUICorp changed its name to Agecorp.

"52. On March 21, 1932, Aprops was merged into Agecorp. The merger was approved by the nominee referred to in Finding of Fact 35, which was the stockholder of record of Aprops and Agecorp. As a result of this transaction, Ageco's investment in Agecorp was increased by $90,-278,053."

"54. At March 31, 1932, Ageco's assets were carried on its books at $690,183,059. By virtue of the transactions described in Findings of Fact 45, 46, 49, 50, and 52, and other transactions of lesser magnitude, $675,134,345 of the total assets of Ageco was represented by its investment in Agecorp."

Covenants of the Ageco FID Indentures.

The Ageco fixed interest debentures had been issued under indentures which contained certain covenants. The Master's Findings of Fact No. 27, 28 and 29 refer to and quote these covenants:

"27. All of the indentures under which the Ageco Debentures were issued, with the exception of the 5½% Convertible Debentures Due 1977 and the Convertible Investment Certificates contained negative pledge covenants, and covenants relating to the conveyance of substantially all of the assets of Ageco as an entirety (hereinafter jointly referred to as 'restrictive covenants'). The indenture under which the 5½% Convertible Debentures Due 1977 were issued, and the Convertible Investment Certificates, contained only the latter covenant. The Convertible Investment Certificates were convertible by their terms into 5% Consolidated Refunding Debentures Due 1968.

"28. The negative pledge covenants in the various series of Ageco Debentures were not identical, but they were substantially similar. The following covenant contained in the indenture covering 4½% Convertible Debentures Due 1949, is typical:

" 'Article III.

" 'Certain Covenants of the Company.

" 'Section 7. Except in the case of purchase money mortgages and liens, and except in the case of pledges in the usual course of business as security for temporary loans maturing not more than one year from their date of issue or indemnity for terms not exceeding one year, the Company will not mortgage or pledge any of its property without by such mortgage or pledge securing the due and punctual payment of the principal of and the interest upon the debentures issued and outstanding under this Indenture, ratably with any and all obligations secured by such mortgage or pledge.'

"29. The covenants in the various series of Ageco Debentures relating to the conveyance of substantially all the assets of Ageco as an entirety, were not identical, but they were substantially similar. The following covenant contained in the indenture covering the 5½% Convertible Debentures Due 1977, is typical:

" 'Article XII.

" 'Consolidation, Merger and Conveyance.

" 'Section 1. Nothing in this Indenture shall prevent any consolidation or merger of the Company with or into, or any conveyances (subject to all provisions hereof and of any and all indentures supplemental hereto) of substantially all the properties of the Company as an entirety, to any other corporation lawfully entitled to acquire the same, or successive consolidations, mergers or conveyances to which the Company or its successor or successors shall be a party or parties; provided, however, that no such consolidation, merger or conveyance shall impair any of the rights and powers of the Trustee or of the holders and registered owners of debentures outstanding hereunder; and provided further that upon any such consolidation, merger or conveyance, the due and punctual payment of the principal and interest of all debentures issued hereunder at the time outstanding, according to their tenor and the due and punctual performance and observance of all the covenants and conditions of this Indenture, and of any and all indentures supplemental hereto, shall, by an indenture supplemental hereto, executed and delivered to the Trustee, be expressly assumed by the successor corporation formed by or resulting from any such merger or consolidation, or to which any such conveyance shall have been made.

" 'Section 2. Every successor corporation formed by or resulting from any such consolidation or merger, or to which a conveyance shall have been made as aforesaid, upon executing an indenture supplemental hereto as provided in Section 1 of this Article XII, in form satisfactory to the Trustee, and upon delivering or causing to be delivered to the Trustee appropriate proofs of such consolidation, merger or conveyance, shall succeed to and be substituted for the Company for all purposes of this Indenture; but no such consolidation, merger or conveyance shall destroy or impair the rights of the holders

and registered owners of debentures to con-vert the same into Class A Stock and Common Stock of the Company upon the terms and conditions provided in Article VI hereof, unless the covenants of the Company contained in Section 7 of Article VI hereof shall be complied with.

" 'The Trustee may receive the certificate of any counsel selected by it (who may be of counsel to the Company) as conclusive evidence that any such indenture complies with the foregoing conditions and provisions of this Section 2.

" 'Section 3. The Trustee shall be under no duty to see that any such successor corporation shall assume the payment of the debentures hereunder and the performance of the covenants and conditions hereof, except as a condition precedent to the vesting in such successor corporation of any of the rights and powers conferred on the Company by this Indenture.

" 'Section 4. The Company covenants and agrees that no consolidation or merger, nor any conveyance of substantially all of the properties of the Company as an entirety to which the Company or any successor corporation shall be a party, shall be made or effected, unless the terms, covenants and conditions contained in this Article shall have been complied with and observed by the Company and/or the successor corporation, as the case may be.' "

### Violations of Covenants of the Ageco FID Indentures.

The Trustee of Ageco and the Ageco FIDs assert that the transactions by which stocks of utility companies, acquired by Ageco and issued in the name of its nominee, Day & Co., were vested in various Ageco wholly-owned subholding companies and finally concentrated in Agecorp in 1931 and early 1932, violated the FID indenture covenants against the conveyance of substantially all the assets of Ageco as an entirety. They argue that the various steps by which Agecorp finally became possessed of all Ageco's properties brought about the same result as the transfer of all the Ageco properties in a single transaction. The very thing that the covenant was designed to prevent, was accomplished by the Hopson management in a series of transactions, and Ageco's properties became Agecorp's without Agecorp assuming the payment of the Ageco FIDs. True, Ageco was not legally consolidated with or merged into Agecorp, because that would have nullified the real purpose of the conveyances. But if we consider the substance and not the form, the conclusion is inescapable that the conveyance of all Ageco's properties to Agecorp through a series of transactions, without the transferee assuming the obligations of Ageco to the FIDs, violated the covenant of the Ageco FID indentures. As the Special Master put it: "We must ever keep in mind that we are dealing with realities. Creditors are not interested in mere forms." He completely answered the argument of the Agecorp 73s and 78s in the following paragraph of his opinion:

"Again be it noted that what cannot be legally done in one act does not necessarily become legal when the act is split up into various steps, all seeking and attempting to do in final result, what the one act might have accomplished. Thus, to transfer assets at separate times makes no difference if the intent and attempt is to accomplish a complete conveyance. Thus the respondents have taken up all proceedings step by step and found each legal in itself, while the petitioner looks at it as a whole, finding a perfect picture of fraud, when each piece is fitted together."

I believe that a trial court would be justified in viewing these separate transactions as parts of a single scheme. The case for the FID debenture holders is further strengthened by the fact that Ageco and Agecorp, the formal parties to these arrangements were controlled by the Hopson management. [The few directors of Ageco who represented Chase Harris Forbes resigned from the Board between May 24th and 28th, 1932.] The indirect means by which this unlawful end was accomplished only serve to accentuate the real purposes of these transactions.

The covenant against mortgaging Ageco's properties—the negative pledge covenant in the Ageco FID indentures—provided that except in the case of purchase money mortgages and liens and temporary bank loans, Ageco would not mortgage or pledge any of its property without securing the payment of the principal and interest of the FIDs "ratably with any and all obligations secured by such mortgage or pledge." The Agecorp Committees of 73s and 78s argue that there was no actual mortgage or pledge of Ageco's properties. Again we must decide between form and substance. The transfer of substantially all Ageco's properties to various wholly-

owned subholding companies, which later transferred these properties to Agecorp, and the subsequent issuance of Agecorp 73s and 78s without securing for all Ageco FIDs their payment ratably with the 73s and 78s, in effect gave priority of payment to the 73s and 78s out of the former Ageco properties. Only the equity in those properties, if any, over and above the amount of the 73s and 78s outstanding, would be available for the payment of the Ageco FIDs by reason of Ageco's ownership of all the capital stock of Agecorp. Thus the result achieved was practically the same as a mortgage or pledge of Ageco's properties for the benefit of the Agecorp 73s and 78s. The impairment of the priority position of the Ageco FIDs is apparent. The holders of Ageco FIDs were supposed to be protected against any such result by the negative pledge covenant of their indentures. The Special Master stated that "although there was here no pledge or mortgage in the strict meaning of the words" * * * "It may be the Court, under the circumstances here developed, would give the word 'pledge' a broader meaning than the mere passing of physical possession." I feel so inclined. [This covenant and its legal impact on the issuance of the Agecorp 8s of 40 will be hereinafter discussed.]

Counsel for the Agecorp Committees of 73s and 78s say that on a motion for a temporary injunction, decided by Justice Schmuck in the New York Supreme Court, August 7, 1933, he held that the Recap Plan did not violate the negative pledge covenants. Rabenold v. Associate Gas & Electric Co., 148 Misc. 507, 266 N.Y.S. 520, 522. He wrote:

"The contention that the plan is a violation of section 7 of the trust indenture is not factually supported. The plan does not, as the court understands it, propose to mortgage or pledge the property of either the holding or subsidiary companies."

It seems to me that the point was not properly presented to that Court. Unfortunately the decision regarded the form of the transactions more than the substance. The following quotation from the opinion indicates that all the facts, even as then known, could not have been before the Judge:

"The solvency of the company is beyond speculation. Its assets are at least equal to, if not greater than, its liabilities, and, what is particularly significant, it has not defaulted on any of its obligations."

It is hard to reconcile this with the literature Ageco was sending to its debenture holders to frighten them into making the exchange. They were told that while the company was earning its fixed interest charges, it might not continue to do so, and that if the Recap Plan was not accepted a receivership for Ageco might result.

In reviewing some of the evidence on the issue of Ageco's insolvency in 1932 the Special Master concluded that under the circumstances he thought it "quite natural for a Judge to hesitate before finding insolvency, if the illegality of bonds depends upon such a finding"; * * * but that "a trial judge, passing upon the issues raised in the Recap hearing, could find that Ageco, in December of 1932 and prior, was insolvent, which may have a strong bearing on the legality of the Recap Plan of May 15, 1933. So too, the 8s of '40 might be affected." In finding No. 76 the Special Master found that "There is an unresolved issue of fact, on which the evidence is in conflict, as to whether Ageco was insolvent in March or July 1932."

Judge Schmuck's decision was really based on two points—that a temporary injunction should never be issued "except when it is imperatively necessary"; and that the plaintiff debenture holder could not bring the action, since under the terms of the indenture "the action must be brought by the trustee when so demanded by a certain percentage of those similarly situated" and the complaint failed to show "compliance or refusal on the part of the trustee." The Judge said that he was "hesitant to use the tools and implements of injunction to wreck a structure (the Plan for the Rearrangement of Ageco's capitalization) built up by considerable thought, effort and material expenditure." He felt that a court should "be wary in superimposing its superficial knowledge of the affairs of a business in contradiction of the specific and detailed knowledge of those who constantly live with the corporation." In all likelihood, if he had had before him all the facts disclosed before the Special Master, he would not have placed so much faith in the Hopson management.

When Judge Julian Mack was sitting in this Court in a 77B proceeding involving Ageco, he heard an application for an in-

junction against the transfer of any assets of the Associated System except on notice to the parties and to the Court. His attention was directed to the transfers of Ageco properties to Agecorp and the issuance of Agecorp 73s and 78s to effectuate the Recap Plan of May 1933. His opinion is reported in In re Associated Gas & Electric Co., D.C., 11 F.Supp. 359 (June 17, 1935). I quote the following from page 368:

"In my judgment, what petitioners must show is such mismanagement and maladministration of the company's business in the past as to create a reasonable fear that there may be a dissipation of assets in the future if no injunctive relief be afforded."

Judge Mack then reviewed certain acts of the Hopson management and granted the injunction. Some of the principal points of attack were against the Recap Plan, the transfers of Ageco properties to Agecorp, the manner in which the plan was presented and the exchanges obtained. Judge Mack discussed these points and stated:

"Thus, if the assertion is true that the transfer to the *corporation* in conjunction with the plan is a fraud upon the *company's* bondholders, the possible injury both to those who have exchanged and to those who have retained their debentures would, in my judgment, give each class a standing to object thereto. Regardless of what decision they make with respect to the plan, all bondholders have a right to object to being forced to make such a hazardous choice, if the forcing of that choice results from the fraud of the management.

\* \* \* \* \*

"There can be no doubt that the *corporation* is little more than a bookkeeping unit of the *company*. It has no real organization, its officers and directors are the officers and directors of the *company*, and its accounts are kept in the offices of the *company* in Ithaca.

\* \* \* \* \*

"Prior to 1932, no statement appears to have been given to security holders of the *company* of the substantial nature of the advances made to the *corporation* or of the reasons therefor. Moreover, although approximately $350,000,000 was advanced to the *corporation* prior to the end of 1929, the *company* now has 6,710,000 shares

of *corporation* stock, indicating additional advances of about $321,000,000 subsequent to 1929. No explanation of these additional advances has been presented to dispel the inference that they were made in anticipation of the Recap plan. Moreover, there seems to be a serious question as to whether these transfers to the *corporation* were made in violation of a covenant in the Associated debentures' indentures, that no conveyance of 'substantially all the properties of the Company as an entirety' shall be effected unless the transferee thereof expressly assumes the obligation to make due and punctual payment of the principal and interest of all debentures. Apparently there was no such assumption of obligation by the *corporation*."

On the trial of the Recap Litigation before the Special Master, the proof concerning the illegal conduct of the Hopson management was much greater than that submitted to Judge Mack on the motion for the injunction. It was revealed at the hearing before the Special Master, for the first time, that Hopson visited the safe deposit vault on March 11, 1932 and removed the Agecorp demand notes and later substituted convertible notes. Further, the forgery of corporate minutes, as demonstrated by an expert was established before the Master, who also heard the testimony of Mr. Stix, one of Hopson's chief assistants, as to how and why Ageco's properties were shifted about, and why Ageco's interest in its wholly-owned holding companies was at different times represented by subscription to stock, open accounts, notes, convertible notes and stock. For one thing Hopson wished to avoid the restrictive covenants of the Ageco FID indentures, according to the testimony of Mr. Stix, one of Hopson's principal executives. The Master summed it all up in the following paragraph:

"So far as the law was concerned as to the general public, in March of 1932, Agecorp was an independent corporation, that is, it had an identity of its own, at least to all appearances. I do not have this feeling as to the Ageco debenture holders who made exchanges under the Recap Plan. This was an intended corporate readjustment. In reality, on the evidence in this case, it is very easy to determine that Agecorp and Ageco were one and the same, and that Agecorp had no separate identity. However this may be, the corpo-

rate entity could not be used as a mere instrument for fraud or for an intentional violation of covenants. A wholly-owned subsidiary whose directors and officers are the same, having no property except that transferred to it by its parent, cannot be used under the circumstances of this case for doing that which the parent could not do itself. This is the crux of the entire case."

In his Conclusion of Law No. 1 the Master lists the principal issues of law involved in the Recap Litigation, all of which he considered reasonably disputable. He indicated however that if the Recap Litigation were prosecuted to a final decision he would probably decide some of those issues of law against the 73s and 78s, including among other issues

"(b) Whether the issuance of the 8s of '40, or the issuance of the 73s and 78s, or both, and the transactions connected therewith, constituted a violation of either or both of the restrictive covenants contained in the Ageco Debentures."

In my opinion the transfer of practically all of Ageco's properties by various steps to Agecorp and the issuance of the Agecorp 73s and 78s was in violation of the negative pledge covenant and the covenant against conveyance contained in the Ageco FID indentures. This court of bankruptcy, using its powers as a court of equity, can enforce the covenants of the Ageco FID indentures against Agecorp, its properties and the Agecorp security holders; and rank the Ageco FIDs as creditors of Agecorp, on a parity with the Agecorp 73s and 78s.

### The Change in the Nature of Ageco's Investment in Agecorp from a Demand Note to a Convertible Note, and Then to Stock.

The year 1932 promised to be a difficult one for the Ageco system. Short term debt was maturing. The problems presented resulted in (1) an attempted issuance of 8% Ageco Bonds to be guaranteed by Agecorp; (2) in the actual issuance of the Agecorp 8s of 40; and (3) in certain changes from a creditor interest of Ageco in Agecorp to a stock interest, which paved the way for the sale of Agecorp's 8s of 40 and for the Hopson Recapitalization Plan, later announced in the Spring of 1933. The Master's Findings tell the story in this fashion:

"61. Prior to 1932, neither AUICorp, Aprops, or Associated General Electric Corporation had issued any securities to the public. At the beginning of 1932, all of the income derived from the investments held by AUICorp and Aprops was available to Ageco.

"62. At the beginning of 1932, Ageco and its subsidiaries were faced with maturities of approximately $50,000,000 during that year, consisting in part of short term obligations incurred in 1931 for the purpose of retiring unmatured long term obligations. The cash position of the Associated System was such that these maturities could not be met unless securities were sold to the public. It was impossible to sell additional Ageco securities ranking on a parity with the Ageco Debentures then outstanding, because the latter were selling in the open market for approximately 20 per cent of their face amount.

"63. In February, 1932, Ageco proposed to issue its 8% Eight Year Gold Bonds (hereinafter referred to as 'Guaranteed 8s'), the payment of principal and interest of which was to be guaranteed by Agecorp after its merger with Aprops. The Guaranteed 8s, by virtue of the guaranty, were proposed to be given priority over the Ageco Debentures and other unsubordinated indebtedness of Ageco.

"64. The precise form of Ageco's investment in Agecorp was a matter of discussion, during the latter part of February and the early part of March, 1932, among the attorneys for Ageco, the attorneys for The Chase National Bank of the City of New York (which was then the indenture trustee for the Ageco 4½s of '49 and 5½s of '58, and the proposed indenture trustee for the Guaranteed 8s), and the attorneys for Chase Harris Forbes Corporation, the investment bankers for Associated System securities. It was recognized by all these lawyers that the guaranty feature of the Guaranteed 8s would not be effective unless any indebtedness owing by Agecorp to Ageco were subordinate to other indebtedness of Agecorp. During the early stages of these discussions, the lawyers were not informed as to the nature of Ageco's investment in Agecorp. They were informed on March 15, 1932, but probably not prior thereto, that the investment was largely in the form of subordinated notes. The attorneys also discussed the possibility that the issuance of the Guaranteed 8s would constitute a vio-

lation of the negative pledge covenants in the Ageco Debentures. There is an issue of fact, on which the evidence is in conflict, as to whether the attorneys for Chase Harris Forbes Corporation discussed with the attorneys for Ageco the possibility that the issuance of the Guaranteed 8s would constitute a violation of the covenant relating to the conveyance of all the assets of Ageco as an entirety.

"65. On March 11, 1932, the attorneys for the Chase National Bank advised Ageco that it would not act as indenture trustee for the Guaranteed 8s, and that they were considering the institution of an action, in the capacity of indenture trustee for Ageco Debentures, to ascertain whether the issuance of the Guaranteed 8s violated the restrictive covenants in the Ageco Debentures.

"66. On March 12, 1932, in an action brought by a holder of Ageco Debentures against Ageco and Agecorp, a motion was made for a temporary injunction against the issuance of the Guaranteed 8s on the ground, among others, that the issue would constitute a violation of the negative pledge covenant. On March 15, 1932, Justice Schmuck of the New York Supreme Court denied this motion. The action was settled and discontinued by stipulation of the parties on May 9, 1932.

"67. On March 15, 1932, after the announcement of Justice Schmuck's decision, Ageco abandoned the proposed issue of Guaranteed 8s, and it was determined to issue the 8s of '40 in lieu thereof. On March 22, 1932, the board of directors of Agecorp authorized the issuance of the 8s of '40."

At this point in the recital it is necessary to go back and quote some of the Master's findings in relation to the form of the notes which represented Ageco's investment in Agecorp in 1931 and 1932. I quote the following findings:

"56. In October, 1931, and in January, 1932, eight predated notes totalling $665,250,000 were issued by AUICorp and Aprops in payment of their open account indebtedness to Ageco. These instruments were deposited in the Ageco safe deposit vault in Jersey City soon after their issuance. There is an unresolved issue of fact, on which the evidence is in conflict, as to whether these instruments were demand notes or interest-bearing convertible obligations containing the following provisions:

" 'At the election in writing of the holder thereof this note may be converted in whole or in part into shares of non-voting preferred stock of the maker having a liquidation or par value of One hundred (100) Dollars per share at the rate of one (1) share of such stock for each One Hundred (100) Dollars of principal due hereon. In the event that this note shall not, before its maturity or payment, have been so converted into stock of the maker as aforesaid, it may, at the option of the maker, be paid in common stock at the rate of one share for each One hundred (100) Dollars of principal due thereon and for thirty (30) days after the same shall have become due. Thereafter the right of the maker of this note to pay the same in stock shall cease and determine unless the maker shall during said thirty (30) days have given notice of its willingness and intention to avail itself of such privilege. In the event of the failure to convert or give such declaration, the right of the maker of this note to pay the same in stock shall cease and determine and the principal and accrued interest then due hereon shall thereupon become due and payable forthwith and the holder hereof shall be entitled to demand and receive payment hereof in cash. In the event of bankruptcy or insolvency of the maker hereof the obligations represented hereby shall not be paid until there shall have first been paid or discharged all other obligations of the maker hereof.'

"If this issue of fact were resolved, it probably would be found that the instruments were in the form of demand notes when issued."

"58. The minute books of Ageco contain no resolutions of its board of directors expressly consenting to the issuance to Ageco of the instruments in either of the forms referred to in Finding of Fact 56. After March 15, 1932, the members of the board of directors of Ageco knew or had notice that Ageco held instruments of Agecorp and Aprops which were in the form of interest-bearing convertible obligations of the type described in Finding of Fact 56. There are unresolved issues of fact and law as to whether the board of directors of Ageco authorized or ratified the acceptance by Ageco of the interest-bearing convertible obligations.

"59. On March 11, 1932, Hopson removed the eight instruments referred to in Finding of Fact 56 from the safe de-

posit vault. On March 15, 1932, Hopson deposited in that vault eight interest-bearing convertible obligations of the type described in Finding of Fact 56. There is an unresolved issue of fact, on which the evidence is in conflict, as to whether the instruments withdrawn from the safe deposit box on March 11, 1932 were demand notes or interest-bearing convertible obligations. If this issue of fact were resolved, it probably would be found that the instruments withdrawn from the safe deposit box were demand notes."

March 11, 1932, was the day when the attorney for the Chase National Bank advised Ageco that the bank would not act as indenture trustee for the Guaranteed 8s. It was recognized by the attorneys for the Bank, for Ageco and for the Chase Harris Forbes Corporation that the guaranty feature of the Guaranteed 8s would not be effective unless any indebtedness owing by Agecorp to Ageco was subordinate to the other indebtedness of Agecorp. That may have been the cue on which Hopson acted on March 11th, 1932, when he removed the eight demand notes from the safe deposit box and later substituted on March 15, 1932, the eight interest-bearing convertible obligations of the type described in the Master's Finding of Fact No. 56. The Master found that if he were called upon to resolve the issue of fact as to the form of the notes Hopson removed from the safe deposit box on March 11, 1932, he probably would find that they were demand notes. With the demand notes changed to this convertible form as the result of Hopson's visit to the vault, steps were then taken by Agecorp to convert part of these notes into Agecorp common stock, preparatory to the sale of Agecorp 8s of 40.

The Special Master made the following findings on the conversion of the notes into stock:

"68. On March 22, 1932, the board of directors of Agecorp authorized the issuance of 3,698,000 shares of $1 par stock for a consideration of $100 per share, and a certificate for those shares was issued the same day. The issuance of the stock was recorded on the books of account of Agecorp by increases in common stock and capital surplus of $3,698,000 and $366,102,000, respectively, and by reductions of $365,250,000 in the interest-bearing convertible obligations held by Ageco and of $4,550,000 in the open account indebtedness then owing to Ageco. The transaction was

reflected on the books of account of Ageco by an increase of $369,800,000 in its investment in Agecorp common stock, and by decreases of $365,250,000 in its holdings of Agecorp interest-bearing convertible obligations and of $4,500,000 in its account receivable from Agecorp."

"69. In the latter part of March, 1932, Agecorp offered the 8s of '40 to the public in letters and circulars, copies of which were sent to all Ageco security holders, which stated that the capitalization of Agecorp, apart from the 8s of '40, consisted of Ageco's holdings of common stock and $300,000,000 principal amount of interest-bearing convertible obligations of the type described in Finding of Fact 56, subordinated by their terms to all other indebtedness of Agecorp; that Agecorp was the owner of substantially all of the assets of the Associated System; and that all securities of Ageco followed the 8s of '40."

"74. Approximately $10,000,000 principal amount of the 8s of '40 were sold to the public, and the proceeds were made available to Ageco by Agecorp. These funds, together with monies derived from other sources, were used by Ageco as follows:

$ 3,216,365 to pay unsecured loans of Ageco;
9,300,000 to pay unsecured bank loans of Ageco which could not have been renewed unless collateralized;
10,459,000 to pay interest and dividends on Ageco's securities; and
11,000,000 was advanced to subsidiaries whose obligations were prior to those of Ageco."

The sale of Agecorp's 8s of '40 was disappointing. Only 25% of the issue was sold. It was apparent that strong measures would have to be taken to reduce Ageco's debt burden, if a receivership was to be avoided. A receivership would have put an end to Hopson's opportunities for personal profit. Then the following occurred:

"71. On June 15, 1932, Agecorp sent a letter to Ageco advising the latter of Agecorp's intention to pay the remaining $300,000,000 principal amount of interest-bearing convertible obligations on July 1, 1932 by the issuance to Ageco, or its nominee, of 3,000,000 shares of Agecorp common stock. On June 16, 1932, receipt of this letter was acknowledged by the vice-president of Ageco, and Agecorp was requested to issue the 3,000,000 shares of stock to Ageco's nominee referred to in Finding of Fact 35.

"72. On or about July 1, 1932, pursuant to a resolution of the board of directors of

Agecorp adopted on June 28, 1932, the remaining $300,000,000 of Agecorp interest-bearing convertible obligations held by Ageco were cancelled and 3,000,000 shares of Agecorp common stock were issued therefor. This transaction resulted in a further increase on the books of account of Agecorp of $297,000,000 in its capital surplus."

"77. The transactions described in Findings of Fact 68 and 72 were effected for the purpose of facilitating the marketing of the 8s of '40. There is an unresolved issue of fact as to whether these transactions were effected for the additional purpose of hindering, delaying, or defrauding the creditors of Ageco."

The Committees of 73s and 78s argue that all this is irrelevant and immaterial to the main issues, that for the sake of the argument it could even be assumed that this was done for the purpose of facilitating the sale of Agecorp's 8s of '40. The master found that that was one of the purposes—to help in the sale of the 8s of '40, but he also found that: "There is an unresolved issue of fact as to whether these transactions were effected for the additional purpose of hindering, delaying, or defrauding the creditors of Ageco" (Finding No. 77). He indicated in Conclusions of Law 1(c) and 2 that if the Recap Litigation were prosecuted to a final decision it was "probable, but not certain" that "the transaction by which Ageco's investment in Agecorp was changed from unsubordinated indebtedness into subordinated indebtedness or from unsubordinated indebtedness into stock, and the transactions connected therewith, are void or now voidable by the Ageco Trustee" * * * "because they constituted a fraudulent conveyance of the assets of Ageco, or because they were transactions, which were unfair to Ageco, between companies having a common board of directors."

A strong case has been made to establish the fraud involved in this scheme by which Ageco's position was changed from that of a creditor of Agecorp to that of a stockholder. Ageco at the time owned all the stock of Agecorp. By issuing Ageco more Agecorp stock in satisfaction of Agecorp's debt to Ageco, the position of Ageco as a stockholder has not improved. Through this transmutation of debt into stock, Ageco's position as a creditor of Agecorp was destroyed and when the Agecorp 73s and 78s were issued they were given a position of apparent priority over the Ageco FIDs.

The Special Master expressed the opinion that the transfer of Ageco's assets took place with some such purpose as the Recap Plan in view. Those transfers were prior to the transmutation of debt into stock. Both the Ageco Trustee and the FIDs, as part of the relief sought in the Recap litigation, ask "that the debt of Agecorp to Ageco converted into stock be reconverted into debt, and that such debt be established as a prior claim against the Agecorp Estate."

The convertible notes were in the grand total of $665,250,000 and were eight in number. Five of the notes totalling $570,750,000, on their face appear to have been issued in the name of AUICorp (later Agecorp) to Ageco under the dates of January 2, 1931, April 1, 1931, September 1, 1931, October 1, 1931, and November 1, 1931. There had likewise been issued in the name of Aprops to Ageco under the dates of January 2, 1931, March 2, 1931 and October 1, 1931 notes totalling $90,000,000. All these notes were identical in form and contained the provision that they were convertible into stock either at the option of the holder or of the maker. The Special Master wrote that "doubt has been thrown upon the legality or the existence of any of these notes." He also expressed the opinion that "There is much to justify the holding that all the notes existing prior to March 23, 1932, if convertible, were convertible by the holder Ageco and not by the maker Agecorp"; that "There is doubt as to the genuineness of the minutes of AUICorp, October 27, 1931, which purported to ratify the execution of the convertible notes"; and that "The assets of Ageco in whatever form they may have taken on the books were in reality debts due Ageco in the amount of $665,000,000 from its subsidiaries through Agecorp." To restore to Ageco its position as a creditor of Agecorp would be one way of undoing the fraud. If that method were followed the Agecorp 73s and 78s would fare far worse than they do under the Compromise.

If the position of Ageco as a creditor of Agecorp, holding demand notes in the sum of $665,250,000, dated as of 1931, were reestablished, Agecorp would be entitled to certain offsets unless Ageco reinstated the Agecorp 73s and 78s as Ageco FIDs. The offsets would be the outstanding Agecorp

73s ($24,244,765), at twice their face value, plus the outstanding Agecorp 78s ($134,598,755) and the interest due thereon. But it can be seen at a glance that even allowing the offset, Ageco's claim would be about twice the combined totals of the Agecorp 73s and 78s, with which Ageco would be entitled to share the Agecorp assets on a parity. Hence Ageco's share would be much greater than that allowed its unexchanged FIDs and certain other Ageco securities under the proposed compromise. According to Appendix B annexed to the report of the Securities and Exchange Commission on the Plan of Reorganization the Agecorp 73s and 78s will receive about 75.18% of the common stock of the surviving company and the Ageco security holders, including the FIDs, will receive about 24%—a 3 to 1 ratio in favor of the Agecorp 73s and 78s.

Counsel for the Committee of 73s tries to make the point that all that was done in 1932 was only to facilitate the sale of the 8s of 40 and that there is no evidence to show that the Ageco management began to consider methods for the reduction in the fixed interest charges on the Ageco debentures until late in January or early in February, 1933. The Master found that the time when the management began to do so was "an unresolved issue of fact on which the evidence is in conflict" (Finding No. 79). Assuming, arguendo, that the demand notes were changed by Hopson into convertible notes in March 1932 and that the conversion into stock was actually made in two subsequent transactions, one for $365,000,000 on March 22, 1932, and the other for $300,000,000 on July 1, 1932 (Findings 68 and 71) to aid the sale of the 8s of 40, and that at the time the Recap Plan was not contemplated—all that would not affect the issue between the FIDs and the 73s and 78s in this litigation. It was the use of the Ageco properties through Agecorp, to give certain Ageco FID holders a prior claim thereto over other Ageco FID holders, that gave rise to the conflict of interests and created an issue between the non-assenting FIDs and those that became Agecorp 73s and 78s under the Recap Plan. Up to the time that unlawful step was taken through the Recap Plan, all the FIDs could have justly complained that the Ageco properties were illegally placed in the name of Agecorp. But when holders of Ageco FIDs exchanged them for Agecorp 73s and 78s, they aligned themselves with the Hopson management to the extent that as Agecorp creditors they now attempt to justify the transfer of Ageco properties to Agecorp. It was a violation of the indenture covenants to transfer the Ageco properties to Agecorp, no matter what the purpose of the transfer may have been—whether it was to raise new money through Agecorp or to reduce the carrying charges of the FID debt, or both.

The Hopson management may have pretended by announcements in August 1932 that with the sale of the 8s of 40 and with money derived from other sources, Ageco was out of its financial difficulties. Such was not the fact. Only 25% of the issue had been sold. It is reasonable to infer that with the failure of the campaign to sell the 8s of 40 and get new money, the use of Agecorp for some such scheme as the Recap Plan to reduce the carrying charge of the Ageco debt, received the active attention of the Hopson management. It may have been contemplated as the second step to be taken, even while the first was being planned—to create new first liens for new money and then to reduce the fixed interest charges on the old Ageco FID debt, which was to be subordinated to the new Agecorp debt. The change of Agecorp demand notes into convertible notes and the subsequent change of all the convertible Agecorp notes held by Ageco into Agecorp stock, support that conclusion.

### The Recap Plan of May 1933.

Income available for servicing Ageco's debt declined steadily in 1932 and early 1933. The Hopson management proceeded to meet that situation by taking certain steps described in the Special Master's Findings Nos. 78, 80, 81, 83, 84, 89, 90, 93 and 94.

"78. On May 15, 1933, pursuant to resolutions of its board of directors, Ageco announced a plan for the rearrangement of its debt capitalization (hereinafter referred to as 'Recap Plan') in a letter which was sent to all the security holders of Ageco. Under the Recap Plan, the holders of Ageco Debentures, then aggregating approximately $265,000,000 in amount, were offered three optional exchanges for their holdings:

"(a) Under Option 1, Agecorp 73s could be obtained in half the principal amount, and bearing the same fixed interest rate, as the Ageco Debentures exchanged;

"(b) Under Option 2, Agecorp 78s could be obtained in the same principal amount as the Ageco Debentures exchanged, but bearing a lower interest rate (ranging from ½ to 1% per annum, payable only if earned) ; or

"(c) Under Option 3, Ageco SFIDs due 1983 could be obtained in the same principal amount, and with the same interest rate, as the Ageco Debentures exchanged. Interest on the SFIDs was payable unconditionally only so long as any Ageco Debentures were not deposited under the Recap Plan, and so long as interest on the latter was paid or provided for. After all the Ageco Debentures were deposited, interest on the SFIDs was payable only out of 'available net income', as therein defined.

"The Recap Plan provided that no more than $50,000,000 principal amount of 73s could be issued under Option 1, and that option could be closed as soon as $100,000,000 of Ageco Debentures had been deposited thereunder. Holders of 73s were given the right to convert their securities into twice their principal amount of 78s at any time between June 15, 1935 and June 15, 1945. Under an agreement dated December 18, 1933, $100,000,000 principal amount of 78s were irrevocably deposited with an escrow agent in order to effectuate this conversion privilege.

"The 73s and 78s were expressly subordinated by their terms to the 8s of '40.

"In 1936, Option 3 was modified by substituting the SFIDs due 1986 for the SFIDs due 1983. These securities were substantially identical, except that the SFIDs due 1986 bore a higher rate of interest under certain specified conditions."

"80. On May 15, 1933, the board of directors of Agecorp, in order to effectuate the Recap Plan, declared a distribution (hereinafter referred to as 'Recap dividend') to Ageco out of its surplus of an amount not to exceed $300,000,000, equal to the principal amount of Ageco Debentures deposited under the Recap Plan, and payable in 73s and 78s, if, as, and when the issuance of 73s and 78s should be required in exchange for deposited Ageco Debentures. At the same meeting, the board of directors of Agecorp authorized the issuance of the 73s and 78s."

"81. At a meeting of the board of directors of Agecorp held on March 30, 1933, there was presented a statement which showed that, according to its books of ac-

count, the surplus of Agecorp at February 28, 1933, amounted to $447,893,053.16."

"83. On May 15, 1933, Ageco assigned its right to receive the Recap dividend to Associated Gas and Electric Securities Company (hereinafter referred to as 'Agesec'), a wholly-owned subsidiary of Agecorp. Most exchanges under the Recap Plan were effectuated by Agesec and companies affiliated to it, pursuant to an offer by Agesec, dated May 15, 1933, and approved by the board of directors of Ageco, which contained the following provision:

" 'The right is hereby reserved to terminate at any time without notice, other than written notice to the depositaries, all of the options * * * or Option (1) without at the same time terminating Options (2) and (3). The right is also hereby reserved to reopen any options so terminated. The undersigned shall not be obligated to make any exchange for debentures not received by the depositaries prior to the termination of this offer or of the particular option.' "

"84. Under the Recap Plan, it was provided that deposited Ageco Debentures were not to be retired, but were to be kept alive pursuant to the terms of an Escrow Agreement dated May 15, 1933. The agents designated under the Escrow Agreement were all employees of Hopson service companies or close associates of Hopson.

"The stated purposes of the Escrow Agreement were to assure that holders of Ageco Debentures depositing under the Recap Plan would receive the same treatment as non-depositors with respect to any future payments of principal on Ageco Debentures made prior to the payment of the 73s and 78s; and to apply any interest savings effected by the Recap Plan (as defined in the Escrow Agreement) to the purchase of debentures of Ageco and Agecorp or debt securities of subsidiary companies. There is an unresolved issue of fact as to whether the Escrow Agreement was devised by Hopson for the additional purpose of providing a method for controlling the reorganization of Ageco in the event that Ageco went into equity receivership."

### The Recap Dividend.

The so-called Recap dividend declared by Agecorp May 15, 1933 was a rather unique arrangement. Ageco's Board of Directors by resolution had requested Agecorp "to declare a distribution of its (Agecorp's) surplus payable in income debentures" of

Agecorp to the extent necessary to carry out the provisions of the Plan for the rearrangement of the funded debt of Ageco. The same individuals sitting as Agecorp's Board of Directors obligingly adopted a resolution to comply with that request. The Agecorp resolution referred to the Recap Plan and its provisions, to the request of Ageco, and to the alleged fact that Agecorp had a surplus "very largely in excess" of Ageco's aggregate principal amount of outstanding Ageco FIDs, totalling not more than $300,000,000. The Agecorp resolution declared a distribution to its stockholder (Ageco) out of the surplus of Agecorp of an amount, in no event to exceed $300,000,000, equal to the Ageco FIDs "which shall be deposited for exchange under said Plan." The amount to be thus distributed out of surplus was payable "if, as and when," from time to time debentures of Agecorp "shall be required for delivery in exchange for debentures of Ageco under said Plan."

One would expect that the entire dividend would have been declared and turned over to Ageco, and that Ageco would then have made it available to its FIDs for exchange purposes under the Plan. If that had been done the unexchanged Agecorp debentures, resulting from the Agecorp dividend, would still be held by Ageco and would now be one of Ageco's assets available to the Ageco FIDs and other Ageco creditors. But this was not done. The dividend was assigned by Ageco to Associated Gas and Electric Securities Company (Agesec) and as we have seen, was made payable only to the extent that FIDs were presented for exchange. When I suggested on the argument that the full dividend should have been declared and turned over to Ageco itself, I was told that the Ageco FIDs would not have made the exchange under those circumstances, because it would not have been to their disadvantage to refuse to do so. Evidently they were to be enticed into making the exchange by the suggestion that the Plan afforded the Ageco debenture holder an opportunity "to improve his position in relation to the properties" (and in relation to other FID holders) and get "a position nearer the source of earnings."

### Means Used to Get Ageco FID Holders to Exchange for Agecorp 73s or 78s Under the Recap Plan

The means used to "sell" the Plan to the debenture holders were of the high pressure type, and cost almost six million dollars. The Ageco FID holders were circularized, telegraphed and visited personally. They were told that interest on the debentures was then fully earned but that "whether it will continue to be earned depends upon general conditions and upon the ability of the Company to finance future cash requirements," and that "the present market quotations for the debentures of this Company indicate public fear of the danger of a receivership." Other literature declared that the Recap Plan "provides a storm cellar position until the storm blows over"; that if the Plan was "not a success, and receivership develops—debenture holders of the Company will be forced to face long delays which usually attend forced reorganization, probably cessation of interest payments, and heavy expenses running over a long period of time"; that it was "to the best interest of debenture holders that receivership and bankruptcy be avoided and that the company and its properties be held together intact." They were warned of "the impending danger of a receivership, which, if it occurs, may result in total loss to debenture holders who elect to hang on and go through with the forced reorganization which will necessarily ensue."

Who constructed the "storm cellar" and how was it built? What made it necessary for Ageco FIDs to make the exchange, if they wished to get "a position nearer the source of earnings"? The answers are to be found in the acts of the Hopson management: They concentrated the title to all Ageco's properties in Agecorp; they changed the form of the Agecorp demand notes held by Ageco into convertible notes; they converted those notes into stock of Agecorp; they declared the Recap dividend; and they promulgated the terms of the Recap Plan on May 15, 1933 and declared it operative July 6, 1933.

Usually a plan for the exchange of securities contains some provision fixing a certain percentage of deposits as the requisite minimum before the plan becomes operative. One of the conditions of the offer signed by Ageco May 15, 1933 was the following:

"1. The undersigned will not be obligated to (but may) make any exchange unless there shall be deposited under this offer, prior to the expiration thereof, (a) debentures of Associated Gas and Electric Company of the above described issues

of a principal amount equal to at least 60% of the principal amount of all debentures of such issues now outstanding, and (b) debentures of each such issue of a principal amount equal to at least 50% of the principal amount of all debentures of such issue now outstanding, in which case the plan described in the above letter shall become effective as soon as such respective principal amounts are so deposited, subject to the right of the undersigned, in its discretion, by written notice to the depositaries, to fix any lesser amount, in which case such plan shall become effective upon the deposit of such lesser amount."

What actually happened was this: On July 20, 1933 Agesec (the corporation to which the Agecorp 73s and 78s, issuable under the Recap dividend, were to be delivered as Ageco's agent) wrote to Transfer & Coupon Paying Agency (a Hopson controlled business trust) a letter from which the following is quoted:

"Under date of July 6, 1933, we advised you that it had been decided to accept for exchange all deposits made under the above mentioned Plan and Offer and such deposits as might be made in the future until you were advised to the contrary, and deliveries of securities have been made to depositors under the Plan.

"In order that there may be no doubt as to said Plan and Offer having become effective, we hereby notify you, as Depositaries under said Plan and Offer, that the total principal amount of the debentures referred to in said Plan and Offer which have already been deposited with you for exchange under said Plan and Offer (which may be less than (a) 60% of the principal amount of all debentures of all issues of debentures now outstanding; and (b) 50% of the principal amount of debentures of each issue of such debentures now outstanding) is hereby fixed by the undersigned as the amount of said debentures required to be so deposited in order that such Exchange or Plan shall become effective."

As of July 6, 1933 the public had deposited about 16 million Ageco FIDs and Agecorp affiliates had deposited about 10 million, a total of about 26 and ¾ million FIDs offered for exchange under the Recap Plan. About 6% of the public holders had accepted the Recap Plan when the Hopson management declared the plan operative. There were $265,000,000 FIDs outstanding when the plan was offered.

The query naturally occurs—why the haste? There probably were two reasons. In the first place the Securities Act had become law May 27, 1933. Section 3 thereof, 15 U.S.C.A. § 77c (a) (1), provided:

"(a) Except as hereinafter expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities:

"(1) Any security which, prior to or within sixty days after May 27, 1933, has been sold or disposed of by the issuer or bona fide offered to the public, but this exemption shall not apply to any new offering of any such security by an issuer or underwriter subsequent to such sixty days;"

The Hopson management may have been unduly concerned lest they be required to conform to the registration and prospectus requirements of that Act, which in that respect went into effect on July 27, 1933. They sought the opinion of outside counsel and were assured that the Company was exempt from the provisions of the Act in offering or exchanging these securities which had been "bona fide offered to the public" before July 27, 1933.

In some of the literature and newspaper notices after July 6, 1933, it was stated that the management had decided the plan to be operative. This might very well indicate to a debenture holder who had received the literature of May 15, 1933, that 50% or 60% of the Ageco debenture holders had deposited their Ageco FIDs for exchange into Agecorp 73s and 78s. The percentage of public holders of Ageco FIDs who had made the exchange was not disclosed when the management announced that the Recap Plan was operative.

### Exchanges Effected Under the Recap Plan.

The Special Master found:

"89. At January 17, 1934, $100,000,000 principal amount of Ageco Debentures had been deposited under Option 1 of the Recap Plan. Shortly thereafter, Agesec informed all others of Ageco Debentures that Option 1 was closed and that no further exchanges of Ageco Debentures for 73s would be made.

"90. Between June 15, 1935 and January 10, 1940, $24,762,020 principal amount of 73s were exchanged for $49,524,040 principal amount of 78s by the escrow agent referred to in Finding of Fact 78."

"93. Holders of approximately $95,000,-000 principal amount of Ageco Debentures deposited their securities under Option 2 of the Recap Plan between May 15, 1933 and April 7, 1936.

"94. Holders of approximately $10,000,-000 principal amount of Ageco Debentures deposited their securities under Option 3 of the Recap Plan between May 15, 1933 and January 10, 1940."

The interest savings resulting from the exchanges made under the Recap Plan are explained in Findings 97, 98, 99 and 102:

"97. As a result of the exchanges made under the Recap Plan, the interest payments of Ageco and Agecorp for the period May 15, 1933 to January 10, 1940, were reduced by an amount of $17,059,318. These interest savings were made known to the holders of Ageco Debentures in a number of letters and other documents sent to all of them at various times from 1933 on.

"98. A person now holding $100 principal amount of 78s, which he obtained directly on exchange for an Ageco Debenture, received an average of $4.66 less in interest to January 10, 1940, than he would have received if he had retained his Ageco Debenture.

"99. A person now holding $100 principal amount of 73s, which he obtained directly on exchange for Ageco Debentures, received an average of $30 less in interest to January 10, 1940, than he would have received if he had retained his Ageco Debentures. The same person, had he converted his holdings of 73s into 78s on June 15, 1935, would have received an average of $15.50 less in interest to January 10, 1940, than he would have received if he had not deposited under the Recap Plan."

"102. The holders of SFIDs due 1986 received 1% additional interest, over and above what they would have received if they had not exchanged their Ageco Debentures under the Recap Plan, in each of the three years prior to January 10, 1940."

In the course of the hearings before me additional data in the form of schedules was submitted which served to modify in some respects and to supply additional details concerning these interest savings. The Master's Findings 98 and 99 have therefore been modified by me as hereinafter indicated.

**Fraudulent Conveyance.**

Counsel for the Ageco Trustee argues that the change of Ageco's investment in Agecorp from debt into stock was itself a conveyance, since a release of debt is a conveyance. § 270, N. Y. Debtor and Creditor Law; Glenn on Fraudulent Conveyances § 213. Taking Agecorp stock was a release of the Agecorp debt, or as counsel put it, a voluntary conveyance of Ageco's sole asset—the debt owed to it by Agecorp. Further it appears to have been a fraudulent conveyance because it was made with the actual intent to hinder and delay the Ageco FIDs, by placing the corporate entity and title of Agecorp and the claims of Agecorp's creditors between the Ageco FIDs and the former Ageco properties. § 276, N. Y. Debtor and Creditor Law. The question of the solvency of Ageco is immaterial, if the conveyance of Ageco's properties was fraudulently made for these reasons.

A somewhat similar situation, where through a series of acts a corporation endeavored to force a scaling down of its own debentures, was before the Supreme Court in First Nat. Bank v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 303, 78 L.Ed. 465, 90 A.L.R. 391. The corporation there involved was the National Radiator Corporation. When it could not get the consent of all of its debenture holders to a voluntary reduction of its debt (5% refused), the corporation, although fully solvent, defaulted on its interest. The minority debenture holders brought suit for their interest. To block them, the corporation was a party to a friendly creditor's suit in equity and to a judicial sale of its assets, to freeze out non-assenting debenture holders. The majority debenture interest, through a committee, bid in the property at little more than scrap value and then transferred it to a newly formed corporation under a Plan of Reorganization. The minority debenture holders attacked the receivership, the judicial sale and the Plan of Reorganization. Mr. Justice Brandeis wrote the opinion of the court, from which I quote the following:

"Reorganization was the primary relief sought. The appointment of the receivers and the judicial sale were the device employed to effect a transfer of the assets of the existing corporation to a new one, thereby relieving both from the payment of

the former's debts.[9] By these means it was hoped to subject all dissenting creditors to the condition of impotency so frequently occupied by minority stockholders."

Justice Brandeis also stated that "The purpose of the transaction was to hinder and delay certain creditors" and that if the corporation had itself attempted a voluntary transfer of all of the assets to a new corporation, "the conveyance would have been fraudulent in law as to dissenting debenture holders"; that "the illegality would not have been avoided by coupling the transfer later with the appointment of a receiver," and effecting it through a receiver's sale. He declared that the purposes of the friendly legal proceeding and the acts done pursuant thereto were "fraudulent in law" and not binding on the non-assenting minority debentures. In his incisive attack on the whole scheme Justice Brandeis cut away the legal form in which it had been disguised and disclosed it for what it was in substance—a fraud. The equitable relief which he held appropriate was that the non-assenting debenture holders should be paid first, before any of the assenting debenture holders "who, by assenting to the plan, co-operated with the corporation and the reorganization committee."

In another case, Shapiro v. Wilgus, 287 U.S. 348, 53 S.Ct. 142, 144, 77 L.Ed. 355, 85 A.L.R. 128, Mr. Justice Cardozo removed the trappings of legality—in the form of a conveyance, an equity suit receivership and an injunction—to get at the substance of the transactions. A judgment creditor who had been blocked in his efforts to reach his debtor's properties to satisfy his claim, submitted a petition in the receivership proceeding of the transferee corporation charging that the conveyance from his debtor to the corporation and the corporation's subsequent receivership, accompanied by the usual restraining order, were all "parts of a single scheme to hinder and delay creditors in their lawful suits and remedies." He asked that he be permitted to issue a writ to sell the chattels in the possession of the receiver for the satisfaction of his judgment. Mr. Justice Cardozo held that the conveyance and the receivership were "fraudulent in law as against nonassenting creditors," even if the aim of the debtor was "to prevent the disruption of the business at the suit of hostile creditors and to cause the assets to be nursed for the benefit of all concerned." He declared that—

"A conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them. Many an embarrassed debtor holds the genuine belief that, if suits can be staved off for a season, he will weather a financial storm, and pay his debts in full. Means v. Dowd, 128 U.S. 273, 281, 9 S.Ct. 65, 32 L. Ed. 429. The belief even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay. This is true in Pennsylvania under the Uniform Fraudulent Conveyance Act, which became a law in that state in 1921. Purdon's Pennsylvania Digest, title 39, § 357 (39 P.S. § 357). It is true under the Statute of Elizabeth (13 Eliz., c. 5), which, in any case not covered by the later act, is still the governing rule. Purdon's Pennsylvania Digest, title 39, § 361, (39 P.S. § 361); McKibbin v. Martin, 64 Pa. 352, 356, 3 Am.Rep. 588; Stern's Appeal, 64 Pa. 447, 450. Tested by either act, this conveyance may not stand. Hogsett v. Thompson, supra; Montgomery Web Co. v. Dienelt, 133 Pa. 585, 19 A. 428, 19 Am.St.Rep. 663; Atlas Portland Cement Co. v. American Brick & Clay Co., 280 Pa. 449, 124 A. 650; In re Elletson Co., D.C., 174 F. 859, affirmed 4 Cir., 183 F. 715; Kimball v. Thompson, 4 Cush., Mass., 441, 446, 50 Am.Dec. 799; Dearing v. McKinnon Dash & Hardware Co., 165 N.Y. 78, 58 N. E. 773, 80 Am.St.Rep. 708; Means v. Dowd, supra."

### The Separate Corporate Entity of Agecorp Should be Disregarded.

As between the conflicting claims of the Ageco FIDs on the one hand and of the Agecorp 73s and 78s on the other, to the

---

[9] "Unless all debenture holders assented to the plan, it could not be effectuated except through the medium of a judicial sale; for the indenture with the Bankers' Trust Company, trustee, provided that the property of the Radiator Corporation should not be sold as an entirety unless 'as a part of the purchase price for the sale of the property of the company as an entirety [the purchaser] expressly assumes in writing the due and punctual payment of the principal and interest of all the debentures,' whereas the main purpose of the plan was to cut in half the amount of the debenture liability and to eliminate all fixed charges through transferring the entire property to a new company."

properties standing in the name of Agecorp which were originally acquired with moneys and securities of Ageco, an obvious and logical solution would be to ignore the separate corporate entity of Agecorp. This would put the Agecorp assets in Ageco and would make the Agecorp 73s and 78s creditors of Ageco on the same basis as the unexchanged Ageco FIDs. They all would have the same rights they possessed before the Recap Plan of 1933, when they all were Ageco FIDs.

The unjust results of the Recap Plan and Agecorp's part therein are readily apparent. Ageco used its wholly owned subsidiary Agecorp as the means through which the Recap Plan was effectuated. The fraud involved in the transfer of Ageco's corporate assets to Agecorp in violation of the covenants of the Ageco FID indentures; in the use of Agecorp as a barrier between the Ageco FIDs and the former Ageco properties; and in the creation of obligations of Agecorp (the 73s and 78s) with an apparent priority to the former Ageco assets—all that fraud makes this a case where a court of equity should disregard the separate corporate entity of Agecorp in order to do justice. The fraud involved in the Ageco-Agecorp transactions was actual fraud, not merely constructive fraud, although the latter is "enough" on which to establish a claim for equitable relief. (Fletcher on Corporations, 1931 Edition, § 44.) The United States Supreme Court has unequivocally stated that "the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice." Taylor v. Standard Gas & Elec. Co., 306 U.S. 307 at page 322, 59 S.Ct. 543, at page 550, 83 L.Ed. 669. In that case there was "the history of spoliation, mismanagement, and faithless stewardship of the affairs of the subsidiary." See comments in Pepper v. Litton, 308 U.S. 295 at page 308, 60 S.Ct. 238, at page 246, 84 L.Ed. 281. But the principle applies equally in favor of the creditors of a debtor whose assets are fraudulently transferred to a debtor owned corporation. That was the situation in Sampsell v. Imperial Paper & Color Corporation, 313 U.S. 215, 61 S.Ct. 904, 907, 85 L.Ed. 1293. In that case Mr. Justice Douglas stated that a bankruptcy court could deal with the matter summarily, without the need of a plenary suit; observing that "mere legal paraphernalia will not suffice to transform into a substantial adverse claimant a corporation whose affairs are so closely assimilated to the affairs of the dominant stockholder that in substance is little more than his corporate pocket." In that case the District Court made an order consolidating the estate in bankruptcy of an individual debtor and the estate of a family corporation to which he had transferred his business in order to hinder and delay his creditors. Mr. Justice Douglas discussed the rights of the creditors of the individual bankrupt and those of the creditors of the corporation, to the assets standing in the name of the corporation. What he wrote is peculiarly applicable to the claims of priority asserted by the Agecorp 73s and 78s. The following appears at pages 219-221 of 313 U.S., at pages 907, 908 of 61 S.Ct., 85 L.Ed. 1293:

"All questions of fraudulent conveyance aside, creditors of the corporation normally would be entitled to satisfy their claims out of corporate assets prior to any participation by the creditors of the stockholder. In re Smith, 2 Cir., 36 F.2d 697. Such priority, however, would be denied if the corporation's creditors were parties to a fraudulent transfer of the stockholder's assets to the corporation. Furthermore, where the transfer was fraudulent or where the relationship between the stockholder and the corporation was such as to justify the use of summary proceedings to absorb the corporate assets into the bankruptcy estate of the stockholder, the corporation's unsecured creditors would have the burden of showing that their equity was paramount in order to obtain priority as respects the corporate assets. Cf. New York Trust Co. v. Island Oil & Transport Corporation, 2 Cir., 56 F.2d 580. The power of the bankruptcy court to subordinate claims or to adjudicate equities arising out of the relationship between the several creditors is complete. Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669; Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Bird & Sons Sales Corporation v. Tobin, 8 Cir., 78 F.2d 371, 100 A.L.R. 654. But the theme of the Bankruptcy Act is equality of distribution. § 65, sub. a, 11 U.S.C.A. § 105, sub. a; Moore v. Bay, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133, 76 A.L.R. 1198. To bring himself outside of that rule an unsecured creditor carries a burden of showing by clear and convincing evidence that its application to his case so as to deny him priority would work an injustice. Such bur-

den has been sustained by creditors of the affiliated corporation and their paramount equity has been established where there was no fraud in the transfer, where the transferor remained solvent, and where the creditors had extended credit to the transferee. Commerce Trust Co. v. Woodbury, supra [8 Cir., 77 F.2d 478].

"But in this case there was a fraudulent transfer. The saving clause in 13 Eliz. which protected innocent purchasers for value was not broad enough to protect mere unsecured creditors of the fraudulent transferee. Clark's Administrator v. Rucker, 7 B. Mon., Ky., 583; Mullanphy Savings Bank v. Lyle, 7 Lea 431, 75 Tenn. 431; Powell v. Ivey, 88 N.C. 256; Lockren v. Rustan, 9 N.D. 43, 45, 81 N.W. 60. To be sure, creditors of a fraudulent transferee have at times been accorded priority over the creditors of the transferor where they have 'taken the property into their own custody.' 1 Glenn, Fraudulent Conveyances and Preferences, 1940, § 238. Cf. O'Gasapian v. Danielson, 284 Mass. 27, 187 N.E. 107, 89 A.L.R. 1159. The same result obtains in case of bona fide lien creditors of the fraudulent transferee. W. T. Rawleigh Co. v. Groseclose, 174 Okl. 193, 49 P.2d 1085; Plauche v. Streater Investment Corporation, 189 La. 785, 180 So. 637. Cf. Haskell v. Phelps, 191 Wash. 567, 71 P.2d 550, 114 A.L.R. 403. And estoppel or other equitable considerations might well result in the award of priority even to unsecured creditors of the transferee, the conveyance being good between the parties. Cf. Kennedy v. Bank of the State of Georgia, 8 How. 586, 613, 12 L.Ed. 1209. Yet none of these considerations is applicable here."

The Agecorp 73s are neither lien creditors nor innocent grantees for value. They are not able to show that to deny them priority would work an injustice. In fact the contrary is true. Here, too, there has been shown fraud in the transfer of Ageco's assets to Agecorp; doubt exists as to the solvency of Ageco at the time of the transfers; and the 73s and 78s have extended no credit to the transferee, Agecorp. As the attorney for the Ageco trustee bluntly put it—the Agecorp 73s and 78s "merely made an unsuccessful attempt to get ahead of other debenture holders (FIDs) in the same class" (cf. First Nat. Bank v. Flershem, supra); and "the use of the dummy corporation, Agecorp, to evade Ageco's legal and equitable obligations to the Ageco debenture holders cannot succeed in giving a priority to the Agecorp debenture holders."

The attorneys for the Committees of Agecorp 73s and 78s argue that Agecorp had a very real corporate entity and issued the Agecorp 8s of 40 with the knowledge of the Ageco FIDs. In my opinion the issuance of the Agecorp 8s of 40 was a violation of the restrictive covenants of the Ageco FID indentures. But there are certain equities that the 8s of 40 can show, that the 73s and 78s never had. The holders of 8s of 40 did extend credit to Agecorp and paid full value for their debentures. They had not been creditors of Ageco. They dealt with Agecorp as a separate entity and only with Agecorp. Because of their better equitable position I feel that the Agecorp 8s of 40 should rank ahead of the Ageco FIDs. The provisions of the Agecorp indentures of the 73s and 78s give the 8s of 40 priority over the 73s and 78s.

### Special Defenses Raised by Agecorp 73s and 78s.

The 73s and 78s raise certain defenses against the claims asserted by the Ageco Trustee and the Ageco FIDs to certain Agecorp assets, or to an equal pro rata participation therein. One defense is the Statute of Limitations.

Ageco is a New York corporation. The principal offices of Ageco and Agecorp were in New York. The various steps in the Recap Plan of 1933 were taken in New York City. Meetings of Ageco and Agecorp directors were held there. The books and records of all the holding corporations involved in the transfer of Ageco's properties to Agecorp were kept either in New York City or at Ithaca, New York. The Trustees of the FID indentures were New York banks. The transfer agent (Hopson's Transfer and Paying Agency) had offices here in New York City. The FID debentures were to be exchanged here under the terms of the Recap Plan of 1933. From every viewpoint, the New York Statute of Limitations is the applicable statute. The claims asserted are equitable actions both in essence and in the relief sought. The applicable New York Statute of Limitations is a ten-year statute. § 53 N. Y. Civil Practice Act; Hearn 45 St. Corp. v. Jano, 283 N.Y. 139, 27 N.E.2d 814, 128 A.L.R. 1285. (See, also, Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 84 L.Ed. 754 and York v. Guaranty Trust Co., of New York, 2 Cir.,

143 F.2d 503. The Ageco and Agecorp petitions for reorganization under Chapter X of the Bankruptcy Act were filed January 10, 1940. The ten-year statute had not expired at the time. This is all so clear that the 73s and 78s seem to have dropped this defense.

Nor does the defense of estoppel withstand careful analysis. The Trustee of Ageco acting for its creditors, is not estopped by what the Hopson management, controlling the boards of directors of both Ageco and Agecorp, did in the name of Ageco and Agecorp, in furtherance of the Recap Plan of May 1933, which was a fraud upon all the Ageco FIDs. The Agecorp 73s and 78s are not innocent third parties, who as creditors advanced money to Agecorp. Their securities were Ageco FIDs when the Recap Plan was promulgated. Whatever rights the 73s and 78s appear to possess as Agecorp creditors grew out of the transactions under attack in the Recap litigation. The Trustee of Ageco, acting for its creditors, seeks to recover Ageco's properties from Agecorp. The compromise permits the Agecorp 73s and 78s as former Ageco FIDs to share in those assets with the unexchanged FIDs, if the assets are returned to Ageco. The 73s and 78s are being deprived of nothing to which they have any claim founded in equity and justice.

The unexchanged Ageco FIDs are not estopped in asserting their claims to these assets. They had nothing to do with the preliminary steps or with the final acts that resulted in the Recap Plan of 1933. They refused to have any part in the Plan. The Ageco FIDs who exchanged for Agecorp 73s and 78s, by so doing helped put the Plan in operation. Whatever they did, was not based on any acts or any inaction of the non-assenting FIDs. It was prompted by a consideration of their own interest. The Agecorp 73s and 78s are "neither lien creditors nor innocent purchasers for value." The facts do not justify the invocation of "estoppel" against Ageco's non-assenting FIDs (Sampsell v. Imperial Paper & Color Corporation, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293). The Agecorp 73s and 78s have no cause for complaint, if the Ageco FIDs, who did not assent to the plan, now receive equitable treatment in this proceeding. First Nat. Bank v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391. A court of bankruptcy may adjudicate the equities arising out of the relationship between the several claims of creditors. Sampsell v. Imperial Paper & Color Corp., supra.

The defense of laches urged against the Ageco Trustee fails for somewhat similar reasons. To support this defense the Agecorp 73s and 78s would have to show that Ageco FIDs knew of the fraudulent conduct of the Hopson management that set the stage for the Recap Plan. Those who made the exchange under the Recap Plan and became 73s and 78s, deny that they knew of any fraud. Even in the face of the disclosures of the Recap litigation they deny that there was any fraud in the transfer of the Ageco properties, in the change in the form of the Agecorp notes, or in the means by which the Recap Plan was put in operation. How can they charge the non-assenting FIDs with any greater knowledge of the true facts than the 73s and 78s possessed. "The essence of laches is not merely lapse of time. It is essential that there be also acquiescence in the alleged wrong or lack of diligence in seeking a remedy." Southern Pacific Co. v. Bogert, 250 U.S. 483 at page 488, 39 S.Ct. 533, at page 536, 63 L.Ed. 1099.

The literature urging the FIDs to accept the Recap Plan informed them that the properties were in the name of Agecorp; but how they got there, the means employed and the real purposes of the Hopson management were kept secret from the FIDs. If the true facts had been fully disclosed, I do not believe that any substantial number of FID holders would have exchanged under the Recap Plan, and the Plan probably would have failed of its purpose. How can there be laches without knowledge? But all the FIDs were chargeable with knowledge of the negative pledge clause and the conveyance clause of the indentures under which the FIDs were issued. Those who exchanged FIDs for 73s and 78s may have waived their rights under those covenants, but the non-assenting FIDs did not waive anything. The holders of Ageco FIDs today may enforce those covenants of the Indentures, regardless of when they acquired their FIDs.

The Ageco FIDs did not lack champions of their rights in the years between 1933 and 1940, although some of the champions quit under questionable arrangements. Litigations in which the transfer of Ageco's properties to Agecorp and the

Recap Plan were under attack, are mentioned in the opinion of the Special Master and in that of the Securities and Exchange Commission. Each holder of an Ageco FID did not have to sue to be free from laches. Southern Pacific Co. v. Bogert, 250 U.S. 483, at page 489, 39 S.Ct. 533, 63 L.Ed. 1099. Wherever the Hopson management could do so, it refused to submit to the jurisdiction of the courts and resorted to delaying tactics. It followed that course in the Berwick suit, in the Delaware Court of Chancery [3] and in the Bird suit in this Court.

---

[3] A bill was filed in the Court of Chancery for the State of Delaware in September 1933, by Tessie Berwick, an Ageco debenture holder, against Ageco (a N. Y. corporation), Agecorp (a Delaware corporation), Associated Gas and Electric Securities Company, Inc. and individual defendants, directors of the New York corporation. Only Agecorp and Associated Gas and Electric Securities Co. were served with process of the Court and appeared. Ageco, the New York corporation, appeared specially and moved to dismiss the bill for want of jurisdiction over it. Agecorp and Associated Gas and Electric Securities Company demurred to the bill. The Chancellor held:

"That the New York Corporation is beyond the jurisdiction of this court and there is no way to force its appearance, is plain. Its motion that the bill against it be dismissed should be granted. No objection to the motion has been presented by the complainant.

"Should the demurrer be sustained? As to some phases of the bill, unquestionably it should. There are three principal features to the bill. The demurrer in its relation to each of them will now be examined."

In so far as the bill sought to avoid the transfer of assets of the New York corporation to the Delaware Company and compel the restoration of the status quo ante, the Chancellor held that the New York corporation was an indispensable party and it would be futile to go further with that phase of the Bill. As to the second form of relief sought—an injunction against the exchange of securities in furtherance of the Ageco readjustment of its debenture indebtedness, the Chancellor held that to the extent that the exchanges were made Ageco and the complainant would be benefited. He said: "the plan so far as I can discover does not purport to force anything upon the complainant. So far as the plan per se is concerned the complainant's status remains unaltered." The Chancellor had before him only a Bill of Complaint and a demurrer thereto. The evidence as to the pressure used to put the plan across, the threats of receivership and the hurried announcement that the plan was operative, apparently were not known to him. The Chancellor went on to discuss the third point:

"What, if anything, has altered the situation of the complainant is the circumstance that some time prior to 1932, New York corporation transferred to the Delaware corporation what appears to have been all of its substantial assets without consideration. The bill alleges in substance that the assets were given away, leaving the New York corporation in a condition of insolvency. On demurrer the allegation must be taken as true.

\* \* \* \* \* \*

"It is objected that as debentures owned by the complainant are not yet due, she is not entitled to present payment and therefore no present relief can be afforded her. It is quite true that the complainant cannot enforce immediate payment out of the assets transferred. But why, if she can make out an equitable case, should she not have a lien? If she cannot, the case of long term debenture holders is in a sorry plight. Must they see their debtor corporation denude itself of all assets without receiving consideration in return therefor and be powerless to protect their equitable right to look to those assets for protection, until the distant maturity date has arrived? It would be unbecoming in equity, which boasts of its efficacy to right wrongs, to say to creditors caught in that situation—'you have a right to a lien which equity recognizes, but the enjoyment of your right shall be postponed until your bonds fall due,' for that may be a distant day, the assets may have vanished from view and the means of proof may have become totally lost. Certainly it would seem that at least the lien should be impressed and its satisfaction postponed to the maturity date."

Although the Chancellor sustained the demurrer to the Bill in its then form he added "the complainant may have leave if desired to amend her bill so as to keep before the court that particular phase of its case which the foregoing indicates as proper for retention." At the time the Chancellor rendered his decision, July 13, 1934, Ageco was before this District Court in an involuntary 77B proceeding, filed June 8, 1934. It does not appear that any further steps were taken in the Berwick suit in Delaware.

The records of this Court show that the Bird complaint was filed November 9th, 1933. The service of the first subpoena was vacated on Ageco's motion on November 28th, 1933, on the ground that the person served was not a proper officer. A second subpoena met a similar fate on January 31, 1934, on the grounds of insufficient service, because Ageco and the complainant were not residents of the Southern District of New York. Both the Bird and Berwick actions became inactive when the involuntary 77B proceeding against Ageco was filed June 7th, 1934. Bird's good faith was questioned by Judge Mack when he sought to intervene in the Ageco 77B proceeding (In re Associated Gas & Electric Co., D.C., 14 F.Supp. 582 at page 584). The record before the Special Master shows that many stockholders' derivative actions were "settled" with funds of Ageco subsidiaries, in the years following the Recap Plan.

That had been the fate of two actions brought in the New York Supreme Court by Equity Acceptance Corporation to enjoin the proposed issuance of Ageco Guaranteed 8s and later of Agecorp 8s of 40.

On March 12, 1932 Equity Acceptance Corporation, as the owner of Ageco debentures sued Ageco and Agecorp in the New York Supreme Court to enjoin the issuance of Guaranteed 8s of Ageco. (Agecorp was to be the guarantor.) On March 15, 1932 Judge Schmuck in denying a temporary injunction, held that the negative pledge covenant would not have been violated by the issuance of the Guaranteed 8s. But Ageco did not go forward with their issuance. The action was settled and discontinued on May 9, 1932 together with a second suit of the same plaintiff, by the purchase of the plaintiff's bonds. (See Special Master's Finding No. 66.)

On April 6, 1932 Equity Acceptance Corporation and an individual Ageco debenture holder sued Ageco and Agecorp in the New York Supreme Court and sought a temporary injunction against the issuance of the Agecorp 8s of 40 on the ground that it would be a violation of the negative pledge covenant to do so. Judge Alfred Frankenthaler denied the motion on April 14, 1932. He wrote "That section (Sec. 5 of Art. III of the Ageco indenture) contains a covenant against mortgages or pledges of its property by the Associated Gas and Electric *Company*. No such mortgage or pledge is contemplated. The bonds are to be debenture bonds of Associated Gas and Electric *Corporation*." The action was settled and discontinued May 9, 1932. The plaintiffs' bonds were bought up as part of the settlement. Thus ended another "representative action." (See Special Master's Finding No. 70.)

The Rabenold action in the Supreme Court, New York County, was not pressed after the motion for a preliminary injunction was denied by Justice Schmuck on August 7, 1933. It was not settled by any payment. The order denying the motion was never appealed. The Rabenold action was discontinued in December 1933. I have hereinabove discussed Judge Schmuck's opinion. The plaintiff in that suit was represented by the same attorneys who were counsel for a large holder of Ageco FIDs, who later made an exchange for Agecorp 73s. They now represent the Committee of 73s. Shortly before this large holder of FIDs made the exchange for 73s in December 1933, the terms of the 73 escrow agreement were worked out. The agreement was executed December 18th as of December 1st, 1933. Its provisions were much more favorable to the Agecorp 73s than the Recap Plan. Under the escrow agreement the 73s did not stand a chance to lose the reduction of 50% in the face amount of their securities. They could become 78s, at twice their face amount, at any time after June 15, 1935 and before June 15, 1945. Between December 1933 and June 15, 1935, if Agecorp became financially involved, the 73s had the right to become 78s at twice their face amount. So that all the 73s irrevocably gave up, when they made the exchange, was half their old fixed interest as Ageco FIDs until June 15, 1935. Why the Recap Plan provided for a reduction of the face amount by 50% instead of a reduction of the fixed interest by one-half, is somewhat of a puzzle, in view of the right of a 73 to become a 78 in twice the face amount after June 15, 1935, and before that if bankruptcy occurred.

We come now to the involuntary 77B proceeding instituted in this Court against Ageco on June 8, 1934. It certainly was brought promptly. The 77B amendment to the Bankruptcy Act did not go into effect until June 7, 1934. I have quoted from Judge Mack's opinion of the Recap Plan in discussing the covenants of the FID indentures. The 77B Ageco proceeding was pending until January 13, 1937. When Ageco came out of that proceeding it was

pursuant to a stipulation [4], under which certain "independent directors" were placed on the Ageco Board to protect the interests of the security holders. Among other things, they were supposed to work out a reorganization of Ageco and Agecorp, merging them into one corporation, in which the Ageco FIDs and the Agecorp 73s and 78s would hold debentures. But once the 77B proceeding was terminated, the Hopson group blocked the independent directors from sources of information, and delayed any plan of reorganization until early in 1939 when a plan was prepared calling for the merger of Ageco and Agecorp and relative parity for their security holders. In May 1939, two of the independent directors resigned in disgust. Finally when the petitions under Chapter X were filed in January 1940, the management annexed a proposed plan of reorganization for both Ageco and Agecorp, pursuant to which both the Ageco FIDs and the Agecorp 78s would be put on a parity, as against the combined assets of both corporations. Those assets were set forth at a value in excess of the combined total of Ageco FIDs and the Agecorp 73s and the 78s.

The Recap Plan of May 1933 was condemned by the Wisconsin Public Service Commission as unfair and inequitable and the courts of that State upheld the Commission's ruling, when Ageco sought to register the Recap securities under Wisconsin law. This litigation was carried on in Wisconsin while the 77B Ageco proceeding was pending in this District. The Wisconsin appellate court's opinion was rendered March 31, 1936.[5] On the other hand the Federal District Court for the Eastern

---

[4] By a stipulation, dated October 26, 1936, the trial and other proceedings in the Ageco-77B matter in this Court, were adjourned pending the making of an agreement for a voluntary disposition of the matter. The terms and conditions that were to be embodied in the agreement are set forth in that stipulation. Among other things it provided for the appointment of three independent directors on a Board of eight and the carrying out of a program "in relation to the integration and simplification of its (Ageco's) System." Paragraph 6th of the Stipulation dealt with the integration and simplification of the System. Subdivision (a) thereof provided:

"(a) The progressive simplification of the corporate structure of the Debtor's System to the end that there shall be but one top holding company (which shall be either Associated Gas and Electric Company or Associated Gas and Electric Corporation, or a successor to one or both of them) controlling the operating companies, with not more than one subholding company intervening between the top holding company and any operating subsidiary, except to the extent that additional intervening subholding companies may be temporarily necessary or desirable in particular situations or for particular purposes."

The stipulation and agreement were to "remain in full force and effect for the period of five years from the date of the approval by the Court of the adjournment of these proceedings" although it was subject to earlier termination on the happening of certain other contingencies, one of which was "the completion by debtor's System of the program of objectives for integration and simplification of the System outlined in subdivision (a) of paragraph 6th of this agreement". A hearing was noticed before Judge Mack for January 8, 1937, to consider the proposed dismissal of the 77B proceedings pursuant to the terms of the stipulation. The hearing was adjourned to January 11, 1937. An order of dismissal was entered January 13, 1937.

[5] A judgment of the Circuit Court of Dade County sustained the Wisconsin Commission, October 10, 1935. On appeal to the Supreme Court of Wisconsin on March 31, 1936, the lower court and the Commission were sustained. The following is quoted from the appellate court's opinion (Associated Gas & Electric Co. v. Public Service Com'n, reported in 221 Wis. 519, 266 N.W. 205, 209):

"In support of the action of the commission in denying the registration, we need and will only consider the finding of the commission respecting the unfairness and inequitableness of the plan. There were outstanding bonds of the company to the amount of $264,000,000 bearing fixed rates of interest and with successive fixed dates of maturity. The plan proposed that, pursuant to acceptance of option (a), fifty million of interest-bearing bonds should be issued, and no more, and the issuance of these might be cut off at any time. The acceptance under option (a) of fifty million of these bonds would cover a hundred million of the bonds of the Company, as those exercising option (a) had to accept new bonds of only one-half the face value of the bonds surrendered. This would leave the holders of a hundred and sixty-four million of the com-

District of Pennsylvania, on the suit of a dealer in securities against the members of the Pennsylvania Securities Commission enjoined that Commission from proceeding with contemplated criminal action against the dealer under the Pennsylvania statute permitting the issuance of securities of a corporation "in the process of a bona fide reorganization of such corporation made in good faith." Evidently the Pennsylvania Commission was of the opinion that the securities of Agecorp to be issued under the Recap Plan did not meet this requirement. The District Judge wrote: "In this case I have examined the plan and, without passing upon its merits or prospect of success, I am satisfied that the proposed reorganization is bona fide and that the securities are being offered in good faith." Utility Investing Corporation v. Stuart, D.C., 11 F.Supp. 391, 393. His decree (January 15, 1934) granting the injunction was affirmed on appeal, 3 Cir., 78 F.2d 279 on April 3, 1935. Of course the District Judge in the Pennsylvania case did not have before him the detailed proof of fraud which was submitted to the Special Master in the Recap Litigation in this Court. The Michigan Public Trust Commission refused approval of the Recap Plan in 1933. Two years later, after a change in its membership, it approved the Recap Plan.

The litigations above referred to show how frequently and in how many jurisdictions the Recap Plan was under attack with varying results—all of which answers the defense of laches pleaded in the Recap Litigation.

█ It is against this background, too, that we must weigh the contention of counsel for the 73s and 78s that to disturb the relations purportedly fixed by the Recap Plan would, in effect, work a fraud upon market purchasers of Agecorp 73s and 78s, as well as upon holders of 73s and 78s who formerly held Ageco FIDs. Persons who purchased Agecorp 73s and 78s at sharply depressed prices, should have been aware of the infirmities of these securities, including the right in the management to reopen Option 2 of the Recap Plan. Those who still owned the Agecorp 73s or 78s, which they acquired through the operation of that Plan, certainly knew its provisions.

### Adequacy of the Differential Allotted the Agecorp 73s and 78s.

█ The proposed compromise, as expressed in percentage ratios, lists an Ageco $100 debenture at 100%; a $100 Agecorp 78 at 117.6%, and a $100 Agecorp 73 at 257.6%. As to principal, the Agecorp 73 was rated at 200%, because it could still be exchanged for a $200 Agecorp '78 under the escrow agreement, while an Ageco $100 FID and an Agecorp $100 '78 were rated at 100%. Thus all three classes of bonds share on a parity as to principal. The differential for a $100 Agecorp '78 expressed in a percentage ratio, is 17.6%, and for a $100 Agecorp 73 it is 57.6%. These

---

pany bonds without the privilege of procuring any of the fifty million fixed interest-bearing bonds. If more than fifty million of these bonds were subscribed for, the fifty million would be allotted according to the whim or favoritism of the officers of the company, perhaps to officers themselves in preference to others if any officers were among the holders exercising option (a). At any rate, the holders of one hundred sixty-four million of the bonds would have no chance to secure any interest-paying bonds. They were relegated, willy-nilly, to taking one class or the other of the income bonds due in fifty years or so. If perchance no income above interest requirements should be earned, those receiving the income bonds would not only receive no interest, but would be barred from recovering any principal for fifty years, by which time all of them will doubtless be in their graves. This is not treating all bondholders alike. It is not equality, and where equality is lacking so is equity.

"By another provision of the plan the surrendered bonds are all to be placed in escrow, and specified persons, as escrow agents, are given the power at their discretion to resurrect the lifeless company bonds and substitute them for those received in exchange for them by the company bondholders. There is no protection against purely arbitrary action of these agents in this respect. Two of the escrow agents are vice presidents of both the company and the corporation. Another is a director of both corporations. The relations of the others to the company are not disclosed by the record, but the three mentioned are a majority of the agents, and the majority control the acts of the agents. Thus the holders of the new bonds would not know what they had. They would acquire only a 'pig in a poke' and would have no means of opening the poke."

percentage ratios are shown in the Special Master's Finding No. 14.

The differential in favor of the 73s and 78s, according to trustee Clarke, represented an allowance for the lesser amount of interest the Agecorp 73s and 78s received compared with what an Ageco FID received. In the case of the 73s the interest lost was calculated according to the so-called insurance theory, and "blown up" to a figure that would represent its realization value, assuming the debtors' estates to be worth $80,000,000. The "interest lost" was calculated by Clarke for the compromise, as $15.50 per $100 Agecorp 73 and for a '78 at $4.66 per $100 debenture. The interest lost was "blown up," i. e., multiplied by a factor 3.77, in order to give a simple claim in the enlarged amount the value of a prior claim in the smaller amount. At the hearing before me on the Plan of Reorganization Dr. Morehouse calculated the last interest figure as $15.77 instead of $15.50 for a $100 '73, and $4.72 instead of $4.66 for a '78. (See findings on second page following [61 F.Supp. 48].)

Dr. Thorp did not ascribe all of the differential to "lost interest." He rated a $100 Ageco FID at 85% of a $100 Agecorp 78 in its right to share in the joint assets. In giving the Agecorp '78 that higher participation he intended to include something for the litigating position of an Agecorp '78 compared with an Ageco FID.

The Agecorp 73s have raised a question as to the adequacy of the differential to cover their "loss of interest" after becoming 73s—the difference between what they received and what the unexchanged FIDs received, as interest. The percentage differentials of the compromise translated into the shares of stock of the Plan of Reorganization are .45 of a share for a $100 Agecorp 78 and 1.47 shares for a $100 Agecorp 73. The Securities and Exchange Commission expressed the view that under the peculiar facts of this case "these blown-up interest adjustments are fair."

In the course of the hearings on the Plan of Reorganization I went into the interest matter very thoroughly. I was impressed, at the time, by some of the arguments made by the attorney for the indenture trustee of the 73s. At my request a number of schedules were prepared and put in evidence through the testimony of Dr. Morehouse, an expert on the staff of the Agecorp Trustees. Later I directed that all of the testimony taken and the exhibits offered on the interest question at the hearings before me on the Plan of Reorganization, be considered also as part of the record before me in the proceeding to review the report of the Special Master on the Compromise of the Recap Litigation. Under Rule 53(e) (2), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the court after a hearing on the Special Master's report "may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions." I have thus elected to "receive further evidence" on this interest question. As a result I have concluded that in lieu of the Special Master's Findings of Fact Nos. 98 and 99, I should make the following Findings, as being more accurate and more detailed:

"I. A person now holding $100 principal amount of 73s, which he obtained directly on exchange for FIDs, received, on the average, $29.22 less in interest to the last interest payment date prior to January 10, 1940, than he would have received if he had retained his FIDs. Of this amount, $17.48 represents the 'interest loss' applicable to the period after April 7, 1936. The same person, had he converted his holdings of 73s into 78s on June 15, 1935, when he first had the right to do so, would have received on the average, $15.77 less in interest to the last interest payment date prior to January 10, 1940, than he would have received if he had not exchanged under the Recap Plan.

"II. Based upon an estimate that $46,-803,990 of the $133,539,655 principal amount of 78s entitled to participate under a plan of reorganization of Ageco and Agecorp, were issued upon the conversion of 73s, and that the remaining $86,735,666 principal amount were issued directly in exchange for FIDs under the Recap Plan, the interest paid to the holders of all participating 78s to the last interest payment date prior to January 10, 1940, including the interest paid on 73s during the period prior to their conversion into 78s, was $8,617,437 less than the interest which would have been paid on the corresponding FIDs. If this interest loss is allocated equally among all holders of 78s, the amount attributable to each $100 principal amount of 78s is $6.45. Of this amount, $3.59 represents the average 'interest loss' applicable to the period after April 7, 1936.

"III. If, in computing the total 'interest loss' on the 78s, the $46,803,990 principal amount of 78s estimated to have been issued upon the conversion of 73s, are treated as though they were all issued on June 15, 1935, the average amount of interest loss attributable to each $100 principal amount of 78s is $5.59.

"IV. If, in computing the total 'interest loss' on the 78s, the $46,803,990 principal amount of 78s estimated to have been issued upon the conversion of 73s, are treated as though they were all issued at the time that the converted 73s were first obtained for FIDs, the average amount of 'interest loss' attributable to each $100 principal amount of 78s is $4.72. Of this amount, $3.08 represents the average 'interest loss' applicable to the period after April 7, 1936."

These new and substitute findings do not affect the Special Master's Conclusions of Law on the interest question.

In Conclusion of Law No. 4 the Special Master held:

"4. Doubt exists as to whether in the event that the Recap Litigation were to terminate in a decision placing holders of Ageco Debentures on a parity with holders of 73s and 78s, the latter would be entitled to adjustments for the interest losses referred to in Findings of Fact 98 and 99 and, if they were, whether they would be given a prior claim for those interest losses. It is probable, but not certain, that these issues would be resolved by giving the holders of 73s and 78s an additional claim, not entitled to priority, equal to the amounts of their interest losses."

The Special Master concluded that the Compromise of the Recap Litigation and related issues, on the basis submitted by the Trustees (which included the differential) was fair and equitable.

If there were no compromise and the holder of an Agecorp 73 were filing a proof of claim he could probably prove a claim for twice the face value of the 73, but would not be entitled to prove as part of his claim any interest, except the amount unpaid on the 73 prior to January 10, 1940, calculated on its face value as a 73, and according to the terms thereof—not as a 78. The holder of a 78 (formerly a 73) could not include in his claim in bankruptcy the interest that he had forgone on the 73, which he had exchanged for the 78 and if the Ageco FIDs were successful in showing that Ageco's property had been transferred to Agecorp in violation of the FID indenture covenants, the FIDs could share as creditors of Agecorp on a parity with the 73s.

If the differential between the 73s and 78s and the FIDs, represents no more than an interest adjustment, a more appropriate solution to the problem of determining the proper amount of the differential might be to recognize the participation of a present holder of an Agecorp 73 at twice the face value of the debenture, plus a sum which would make good to him the extra interest he might have received as an FID, *during the time he actually owned the 73*. Likewise we might provide that each holder of a 78 should receive in addition to the face amount of his debenture a sum that would represent the additional interest he would have received, if *during the time he owned the 78* it had earned the interest of an FID debenture. But to do this would entail a great amount of paper work for the holder of a 73 or a 78, and also for the Agency through which the surrender of the debenture and the holder's proof of the period of ownership would pass, in allotting to that debenture its proper number of shares of stock of the surviving company, under the Plan of Reorganization. The attempt to do more exact justice to each individual holder in this way might make the Plan itself unworkable. The more reasonable course is to deal with them as classes—either 73s or 78s.

Counsel for the 78s have several times shifted their position on the adequacy of the differential allotted them under the present Plan of Reorganization considered as an interest adjustment. At times they indicated that it covered the maximum of their interest loss as a priority claim. According to their own figures the stock differential allotted completely covers all interest lost by the 78s as a group, taking the viewpoint most favorable to the 78s, including priority for the interest claim. The differential of .45 shares of stock per $100 debenture, is worth at least $6.04 and probably $6.50. The maximum interest loss that might be claimed for the 78s would be $6.45 per $100 debenture (including the loss of interest of 73s exchanged for 78s). But figuring their total interest loss, on the basis that they all were formerly FIDs which were exchanged directly for 78s, a differential of $4.72 would be the maximum allowable for their interest

loss as a priority claim. There is no basis, legal or equitable, for allowing the 78s as a class the interest lost by some of the 78s while they were 73s.

The Agecorp 73s complain that the differential allotted them as a class is inadequate. In a supplementary brief on the interest question, the attorney for the Indenture Trustee for the 73s says:

"We have no objection to making payment of the interest adjustment in an amount of common stock. We believe it to be the best method that can be devised. Our objections go to the *amount*—to cutting down the interest adjustment on the fire insurance theory, the April 8 theory, or any other theory."

The 73s point to the figure of $29.22 "lost interest" and say that their differential allotment does not approximate that figure as a priority claim. But that figure does not tell the whole story—as we shall see. In the great majority of cases the holders of 73s are receiving much more interest than they forewent while they owned the 73. A great number of the present holders of 73s actually lost little or no interest by being 73s instead of FIDs, because they acquired their 73s after January 10, 1940. There has been considerable trading in the 73s since January 10, 1940. During that period neither FIDs nor 73s received any interest. Likewise, there was trading in 73s between June 15, 1935 and January 10, 1940. Those who bought 73s after June 15, 1935, could have bought 78s or could have exchanged the 73s for 78s, if they wanted more interest. If they have received less interest than the 78s it was the result of their own choice. Not more than 30% of the present holders of 73s actually owned the FIDs, which were exchanged into 73s, before January 1934, when Option 1 was closed. They are the only holders who might have some basis for arguing that they "lost" about $30 of interest as the Master found (actually $29.22) on each $100 principal of their 73 bonds. Under both the Compromise and the Plan of Reorganization the 73s are dealt with as a class and the differential allowed will be the same for every holder, regardless of when he acquired his 73 debenture.

Under the terms of Option No. 1 of the Recap Plan, the holder of a $200 FID could elect to exchange it for a $100 Agecorp 73 at the same fixed interest rate, and the holder of the resulting 73 was given the right to claim ($200) twice its face value, in the event of Agecorp's bankruptcy. But that did not include the right to recoup the interest foregone while the face value of the 73 was $100. Further, after June 15th, 1935, the holder of a $100 Agecorp 73 could elect to change it into an Agecorp 78 of $200 principal amount; but that right did not carry with it any claim for interest already sacrificed as a 73. The right to make the exchange of a 73 into a 78 was exercisable at any time between June 15th, 1935 and June 15th, 1945, according to the provision of an Escrow Agreement. If in effect the 73s exercise that right at this time, in claiming twice their face value as 73s, then any lost interest claim should also be on the same basis as a 78. If the holder of an Agecorp 73 had exchanged it for a 78 in 1939, pursuant to the Recap Plan, he would have received from the escrow agent under the Escrow Agreement, an Agecorp 78 debenture. If a coupon bond, it would have had all prior coupons removed, and if a registered bond, it would carry interest only from the last interest date. Why should the holder of an Agecorp 73 be in any better position after January 10, 1940, than before that date so far as the interest is concerned?

The greater number of the 73s are coupon bonds. The coupon was separable from the bond. By itself the coupon was an agreement by Agecorp to pay the holder a certain sum on a certain date. The person who owned the bond at the time and cashed the coupon bearing the reduced interest rate, is the one who made the interest sacrifice. If he later sold the bond, no right to recover the sacrificed interest went with the bond. The transfer of the bond to the new owner was an assignment of the right to collect the principal of the bond on the due date, together with the coupons attached thereto when they fell due. It is difficult to see any basis whatsoever for a claim for lost interest in a present holder of a bearer bond, except on the coupons he himself cashed. Indeed, by the Trapa decision (In re Associated Gas & Electric Corporation, 2 Cir., 137 F.2d 603), the holder of a past due coupon who did not present it before January 10, 1940, is given no priority.

Likewise when the holder of a registered bond received a check at the reduced interest rate, he received an instrument which he could deal with as something

separate from the bond. He could have the interest check certified; he could cash it; he could endorse it over to a third party. If he did not cash it before January 10, 1940, he gets no priority under the decision in the Trapa case. But if he used the check—that satisfied his interest claim for the period covered by the check. A subsequent purchaser of the bond did not make any interest sacrifice, except for the period during which he owned the bond. He obtained no right to any interest which the prior holder may have foregone, while the prior holder owned the 73 when he might have held on to his FID.

The total in stock allotted as a differential to the present owners of the 73s as a class is in excess of the sum total of what they individually gave up as interest *while they owned* the 73s. If, as to some members of that class, their share of the total differential allotted to the class under the Plan of Reorganization may not do exact justice, it will not be very far from it, even treating the lost interest as a priority claim. The stock allotment for the differential (1.47 shares on each $100 face value of the 73 debenture) is worth about $20, assuming a net value of $100,000,000 for the common stock of the surviving company. The testimony of Dr. Thorp and Mr. Morehouse would easily support that very conservative valuation. Even if we assume, arguendo, that every present holder of a $100 73 has given up $29.22 of interest and has a prior claim therefor (neither assumption is true) he would be receiving in the value of the stock allotment in the differential about 70% of the entire "interest loss," and as a prior claim. As the value of the common stock increases the above percentage of full recovery increases.

If the present unexchanged FIDs had become 78s prior to April 7, 1936, the 73s (all of which were received on exchanges made prior to January 1934) would have no basis at all for asserting a claim of priority to the Agecorp assets. Thus the 73s would have received nothing for the interest they gave up by changing into 73s at the earlier date. After April 8, 1936, a $100 73 received $17.48 less interest than a $100 par FID; and a $100 par 78 received between $3.59 and $3.08 less interest than a $100 par FID. The stock differential allowed the 73s and 78s under the Plan of Reorganization exceeds in value, on a priority basis, these amounts of "interest sacrificed" by the 73s and 78s as a class after April 8, 1936.

Another approach to the solution of the interest problem assumes Option 2 still open to the FIDs. It is asserted that the act of the Ageco directors in closing Option 2 on April 7, 1936 was illegal, and that this Court in determining the fairness of the Compromise may now consider Option 2 as reopened, permitting the FIDs to become 78s, without an actual exchange, just as the 73s in the event of Agecorp's bankruptcy had the right under the Recap Plan to become 78s.

In Conclusion of Law No. 1 the Master listed various issues of law in the Recap Litigation, which he considered reasonably disputable. Among them was—

"(f) Whether Option 2 of the Recap Plan is still open and holders of Ageco Debentures may exchange their securities thereunder for 78s;"

When the holders of FIDs exchanged for 73s and 78s they knew that under the Recap Plan there was no time limit set on the exchange of FIDs into 78s under Option 2. That was part of their bargain. The Hopson management reserved the right to close Option 2 when they pleased —and what is more important to reopen Option 2 when they pleased. When on April 7, 1936, the management closed Option 2, they did not say that they gave up that reserved right—to reopen Option 2 to the unexchanged FIDs at a later date. In fact that reservation was in the Recap Plan itself. Where is there any inequity therefore in considering Option 2 as reopened in determining what would be fair treatment for the unexchanged FIDs who claim to have been defrauded by the Recap Plan? If they were thus defrauded they have the election to affirm or disaffirm it— whichever might be more advantageous to them.

The argument is made that the FIDs could be charged, for the privilege of now becoming 78s, a sum equal to the amount of interest the FIDs received over the 78s, for the period of April 8, 1936, to January 10, 1940. This would mean that each $100 FID would have to contribute $3.14 to the common assets. On this theory, no amount for lost interest should be included in the differential allowed the 73s or 78s. The share of the 73s and 78s in what the FIDs would have to pay into the common assets in order to exercise the

privilege of conversion, would be much less than what the 73s and 78s now receive as a differential under the Plan of Reorganization.

There is still another and very practical theory which may be applied in deciding whether or not the 73s have been treated fairly in an allowance for lost interest. It is known as the "fire insurance theory." It would compensate the 73s for so much of the interest as they sacrificed in order to obtain a position of priority as to principal over holders of FIDs who did not exchange under the Recap Plan. The balance of the 73s interest loss was sacrificed so as to assure the 73 holder that his fixed interest would be paid before the 78s received their "if earned" interest. Each holder of a 73 received this fixed interest thus assured, so he got what he paid for, and what he gave up in interest to get that assurance is non-compensable. The 73s could have become 78s after June 15, 1935, if they wished. The "fire insurance theory" would thus treat all 73s as though they had been exchanged for 78s on June 15, 1935, and as though they had received the same interest a 78 of twice the face amount received after that date. It considers the major part of the interest they sacrificed as 73s after that date as having been given up to assure them priority of interest payment over the 78s. In determining the present interest loss of a $100 73 the fire insurance theory would add to the interest a $100 73 gave up prior to June 15, 1935, the interest a corresponding $200 78 sacrificed after that date. The interest loss of a $100 73 under the fire insurance theory would be $15.50, according to Mr. Clarke or $15.77 according to Dr. Morehouse, but not $29.22.

The unexchanged FIDs argue that the interest the 73s and 78s gave up was of no real benefit to the FIDs; that the former owners of FIDs, who became 73s and 78s by making the exchange under the Recap Plan, helped make possible the culmination of the plan; and that this was in fact a detriment to the Ageco FIDs. It is also urged that out of the $17,000,000 interest "saved" by Ageco through the reduced interest of the 73s and 78s, at least $6,000,000 was spent to "sell" the Recap Plan by all kinds of publicity and solicitation. The FIDs say that there should be added to that expense the large sums which the Hopson service companies continued to draw from the Associated System companies down to the time those service companies were mutualized, and other large sums wasted by the Hopson management in opposing the enactment of the Public Utility Holding Company Act of 1935. Thus they conclude that there actually was no net saving of $17,000,000 for Ageco.

The Special Master in Conclusion of Law No. 5 stated:

"5. Doubt exists as to whether, in the event that the Recap Litigation were to terminate in a decision placing the holders of Ageco Debentures on a parity with holders of 73s and 78s, the latter would be required to deduct the expenses of the Recap Plan referred to in Finding of Fact 96, from their provable claims."

Finding of Fact No. 96 to which that conclusion refers, reads as follows:

"96. Approximately $6,000,000 was spent by Ageco, Agecorp, and Agesec, in publicizing and soliciting exchanges under the Recap Plan, and in defending various actions and proceedings in which the validity of the Plan was being, or might have been, attacked."

As the record of the misdeeds and waste of the Hopson management is scanned (see the Securities and Exchange Commission's opinion) the conclusion is inevitable that all Ageco FIDs would have been much better off if Ageco had gone into receivership in 1932 or early 1933 and had thereby broken the grip of the Hopson management on the Associated properties. The unexchanged FIDs received no benefit from the Recap Plan, or from the transactions that made it possible. In fact those transactions deprived the non-assenting FIDs of the properties to which they had the right to look for payment, with all other FIDs. The FIDs did not receive the $17,000,000. It is hardly equitable to charge the FIDs for what the 73s and 78s claim to have "contributed" in making possible the consummation of the Recap Plan. The Special Master's Conclusions of Law on the interest issue are sound.

The attorney for the Ageco Trustee in a supplemental brief succinctly summed up the various theories of interest adjustment, in a paragraph from which I quote as follows:

"Should the interest adjustment be for the entire period or only until April 7, 1936 when Option 2 was purportedly closed? Should the adjustment be based on what the FIDs received in excess of payments

to the 78s, or on what the 73s and 78s 'lost' compared to the FIDs? Should the class of 73s or 78s inherit interest lost by persons not now holding such debentures or, approaching it from the Ageco side, should the holders of Ageco debentures who purchased them recently and received little or no 'extra interest' be forced to give up what they never received? Do the 78s as a class inherit the interest lost by prior holders of 73s which were later converted into 78s? Should the interest adjustment be a simple claim or should it be a prior claim or the equivalent?"

The more I have analyzed the contentions pro and con on the alleged inadequacy of the differential allowed the 73s and 78s under the Plan of Reorganization, the more convinced I have become that Dr. Thorp was right when he said that the differentials were intended to compensate the 73s and 78s respectively not only for any proper claim for lost interest, but also for their asserted better litigating position. If the differentials are viewed as compensating the 73s and 78s for "lost interest" only, they are over generous. The differentials include much more than the total of the actual interest loss of all the present holders of the 73s and 78s. It is well up in the high range of the most favorable possible results for the 73s as a class. The fact is that the Compromise of the Recap Litigation comes close to putting the 73s and 78s, as classes, back in the position they would have occupied as FIDs if there had been no Recap Plan, paying them all interest lost by their original exchange. That accords them very fair treatment, considering all the arguments that can be advanced for treating their "lost interest" as a simple claim at best, entitled to no priority, and being rather limited in amount.

The attorney for the Indenture Trustee of the 73s lays great stress upon the case of Fleeger v. Ames, 10 Cir., 120 F.2d 803, 806. In that case certain preferred stockholders, who were induced by fraudulent representations to exchange their preferred stock for common stock, were restored to their former position as preferred stockholders by a decree of the Court. But their stock claims were "subjected to offsets being made and charged against them any and all sums received by them in connection with the exchange of such stock, as well as the dividends which they received while occupying the position of common stockholders over and above the dividends which they would have received had they remained at all times preferred stockholders." It is argued that the Fleeger case is a precedent for the claim of the 73s to reimbursement on a priority basis for the interest they "lost" while they were 73s, as compared with what the Ageco FIDs received as interest. The real parallel would be between an Ageco FID in this case and the defrauded stockholder in the Fleeger case. On the doctrine of the Fleeger case an Ageco FID, as a condition to becoming an Agecorp 78, could be required to pay into the Agecorp estate the interest the Ageco FID received in excess of what an Agecorp 78 received. Under that procedure, Option 2 of the Recap Plan would be considered either as still open or as reopened by this Court under its equitable powers, so as to permit the Ageco FIDs to change into Agecorp 78s. However, if the covenants of the FID indentures were in fact violated by the transfer of the Ageco properties to Agecorp and by the subsequent issuance of the Agecorp 73s and 78s, and I believe they were, then the non-assenting Ageco FIDs would have the right to share in the former Agcco properties without any charge whatsoever. Equity might impose a lien on those properties to protect the rights of the non-assenting FIDs. But on either theory, the 73s and the 78s would not be entitled to anything by way of "lost" interest. So they fare much better under the Compromise.

Another case on which the 73s place great reliance in asserting their right to their "lost" interest on a priority basis is Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099. In that case the Southern Pacific Company was the majority stockholder of the Houston & Texas Central *Railway* Co. and dominated it. Through several subsidiaries Southern Pacific owned floating indebtedness of the Houston Company, which it caused to be reduced to judgment. Southern Pacific then had the mortgage on the properties of the old Houston company foreclosed and acquired the properties in the name of a new company, the Houston & Texas Central *Railroad* Company. The old company's bonds were exchanged for bonds of the new, but Southern Pacific received all the common stock of the new company and the minority stockholders of the old company received no part thereof. Some of

the old minority stockholders (Bogert et al.) sued Southern Pacific for their proportionate part of the stock of the new company. It was held, that although the Southern Pacific by its conduct constituted itself a trustee of the new stock for the benefit of the stockholder of the old company, in an accounting to the minority stockholders of the old company the Southern Pacific was entitled to a credit of the amount of the old floating indebtedness of its subsidiaries wiped out by the foreclosure, plus the reorganization expense and charges. The latter had been held a proper offset by the lower court and as apportioned among the stockholders of the new company amounted to $26 a share, but no credit had been accorded Southern Pacific for the floating indebtedness of its subsidiaries wiped out by the foreclosure of the prior lien of the mortgage. The Supreme Court held that the minority stockholders should not be thus unjustly enriched and it directed the District Court to ascertain what additional sum the minority stockholders should be charged for stock in the new company "to afford to the Southern Pacific appropriate compensation for its contribution."

In the Bogert case the Southern Pacific had reduced to judgment the claims of its subsidiaries against the old Houston Company. The lien of these judgments was wiped out by the foreclosure of the mortgage on the properties of the old Houston Company. The lien thus lost had priority over the common stockholders of the old Houston Company. The decision of the Supreme Court was based upon the position of the Southern Pacific as one who had bought in at a foreclosure sale and either waived or satisfied lien obligations it had owned and which were wiped out by the foreclosure. That concept (the analogy of an ordinary foreclosure) was stressed in subsequent proceedings in the Bogert case in the Circuit Court of Appeals, Second Circuit. See opinion of Judge Hough reported in Bogart v. Southern Pac. Co., 290 F. 727 at page 730.

The 73s in the present case had no lien for interest forgone. They were like officers who leave money in a business which they might have drawn out as salaries. At best they are simple creditors. In the Bogert case [290 F. 731] the Southern Pacific, in its accounting, made certain "demands arising out of the subsequent acquisition of certain adjunct or branch railway lines and coal mines in order to expand the business of the new Railroad Company." This was denied them because the increase in value resulting from the additions was represented by the stock of the new company in which they all shared. Southern Pacific might have drawn the money out in dividends instead of devoting it to improvements, but did not. In the present case there is no way of identifying the interest forgone by the 73s as having been passed on to the FIDs. Indeed, it may have remained with Agecorp or it may have been used downstream in the Associated System, instead of passing upstream to Ageco. Assuming it did pass upstream to Ageco it would not follow that it was used to pay interest on the unexchanged FIDs. It may have been used for other Ageco purposes, to pay interest on obligations that do not participate under the plan of reorganization, or to pay off subordinate securities maturing between 1933 and 1940. It cannot be said and it has not been shown that the unexchanged FIDs received any part of it.

The 73s cannot very well argue that Agecorp owes them the so-called "lost interest." They got the interest Agecorp contracted to pay them under the terms of their Agecorp 73 debenture, at least down to January 1940. If anyone owes them the interest forgone it is Ageco. For that interest they would be creditors of Ageco —ordinary creditors, not creditors with any right to priority. That was the view of the Special Master and of the Securities and Exchange Commission. The Agecorp 73s and 78s actually get several times their "lost interest" in the differential allowed them under the Compromise.

### The Compromise and Plan Are Fair in Their Treatment of the Agecorp 8s of 40.

As I stated at the outset, the Compromise fixed the amount of the claim to be allowed the Agecorp 8s of 40, and its priority over all other claims; but the Compromise left open the manner in which this prior claim was to be satisfied. The Committee and Indenture Trustee for the 8s of 40 opposed the Compromise upon the ground that the amount of the claim allowed was inadequate. However, they do not oppose the Plan of Reorganization; indeed they support it upon the premise that the provisions of the Plan, and particularly the conversion provisions of the

new Debentures to be allocated to the 8s of 40, compensate them for the inadequacy, as they see it, of the Compromise.

In these circumstances, and because of the condition attached to my approval of the Compromise that it be substantially incorporated in and effectuated by a plan of reorganization, duly accepted and confirmed, I deem it unnecessary to consider in detail the arguments advanced by the representatives of the 8s of 40 in opposition to the Compromise, in so far as it concerns them. Ageco's Trustee and the representatives of the Ageco FIDs in the course of the Recap Litigation have attacked the position of the Agecorp 8s of 40 claiming that their issuance was in violation of the covenants of the Ageco FID indentures, and that Agecorp is a fraudulent transferee of Ageco's assets. These arguments do not carry the same weight when applied to the 8s of 40, as they do in the case of the 73s and 78s. It is my judgment that there are "equitable considerations" inherent in the claim of the 8s of 40 arising from the circumstance that they were issued by Agecorp for cash which, in turn, was made available to and was used by Ageco for various purposes—such as to discharge obligations which were either secured or would have to be secured as a condition of their renewal. The 73s and 78s were issued in exchange for other securities (FIDs), with no resulting increment in the properties of Ageco and Agecorp viewed together. The issuance of the 8s of 40 did provide such an increment and in that sense might be construed as akin to subsidiary financing. The Agecorp 73s and 78s are by the terms of their indentures subordinate to the Agecorp 8s of 40.

■ These observations on the strength of the claim of the 8s of 40 do not, however, compel the conclusion that they are enforceable according to their terms. Equity may require no more than that the holders of these securities be made whole for their advance to Agecorp, that is, that they receive principal and legal interest, less any excess over legal interest that they have received over the years. Upon such a resolution of the case they would receive almost exactly the same amount as the Plan accords them.

■ Under the Plan the 8s of 40 receive 4¼% convertible 10 year debentures in an amount, with respect to each $100 principal amount of old bonds, equal to $102.56, plus interest on the principal amount of the old bond at 4% per annum from July 10, 1943 to the effective date of the Plan. New Debentures are to be issued in multiples of $50—and odd amounts of claims will be paid in cash.

The new Debentures, although unsecured, are to be junior only to the new Senior Debt not to exceed $15,000,000 (a sum substantially in excess of the amount of such debt which, from the record made before me, may be required for consummation of the Plan) and senior to all other securities to be issued by the reorganized company. The conversion rate of the new Debentures has been ingeniously geared so as to minimize the possibility of any immediate substantial dilution of the new common stock, and to provide, nonetheless, an attractive possibility for the new Debentures to share in any substantial appreciation in the value of the reorganized company, reflected in the market value of its common stock.

I find that treatment to be fair and equitable. I concur in the conclusions of the Special Master (C2) that while doubt exists as to the status of the 8s of 40, the probabilities are in favor of their enforceability according to their terms. It would be difficult, if not impossible to find a precise balance between these conclusions, but I am satisfied that the securities provided for the 8s of 40 by the Plan are "the equitable equivalent" of their somewhat doubtful claim to priority for both principal and interest to date. See, Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523 at page 565, 63 S.Ct. 727, 87 L.Ed. 959.

## The Compromise and Plan Are Fair in Their Treatment of the Ageco Sinking Fund Income Debentures (SFIDs).

■ The Compromise establishes the ratios of participation of the SFIDs due 1983 and the SFIDs due 1986, at 79 and 76 respectively as compared with 100 for the FIDs. The Plan translates these ratios into common stock participations. I consider the Compromise and the Plan fair in thus recognizing the SFIDs as in a somewhat less favorable position than the FIDs.

Their impaired position as compared with the 73s and 78s is in some measure attributable to affirmative action on their part; they elected to take the SFIDs in

exchange for their FIDs, and thus remained creditors of Ageco. Moreover, the SFIDs of 1986 received interest during the three years prior to the trusteeship at a rate approximately 1% in excess of the rate payable upon the FIDs for which they were exchanged. Although the SFIDs might fare substantially as well as the FIDs were the Recap Litigation to be determined upon the basis that the Recap Plan status quo be undone, disposition of the litigation upon some of the other theories advanced (such as reopening Option 2 to the unexchanged FIDs) would not have this result. I believe that the provision for the SFIDs appropriately reflects this difference of litigating strength between them and the FIDs. It should be noted, too, that the participation accorded the SFIDs amounts to only about 1.91% of the new common stock to be issued. The Indenture Trustee for the SFIDs has indicated its approval of the Compromise and the Plan.

### The CDCs, the COs and the Preferred and Preference Stock Are Properly Accorded Some Participation Under the Compromise Plan.

There remains for consideration the fairness of the Compromise and the Plan as they relate to the treatment accorded the holders of the following securities of Ageco:

Convertible Debenture Certificates (CDCs);

Convertible Obligations (COs);

Preferred and Preference Stocks;

Interest Bearing and Non-Interest Bearing Scrip (IB and NIB Scrip).

The nature of these securities—other than the Preferred and Preference Stock—is discussed fully in In re Associated Gas & Electric Co., D.C., 53 F.Supp. 107, and in Elias v. Clarke, 2 Cir., 143 F.2d 640, and need not be repeated here. Were it not for the opinion of the appellate court in the last mentioned case, it would not be necessary to say more concerning the participation accorded the CDCs, COs and Preferred and Preference Stock, than to indicate my approval of the conclusion reached by the Special Master, which I have quoted on page 100 of this opinion [61 F.Supp. 60].

In Elias v. Clarke the Circuit Court had under review and affirmed my order confirming a portion (and reserving for future decision the remainder) of the report of the Special Master classifying the claims represented by CDCs, COs and Scrip. The same Special Master had heard and had before him the proposed compromise. He found that the CDCs, the COs and the Scrip represented claims junior to the remaining debt securities of Ageco and Agecorp. His Report on the Compromise did, however, contain a paragraph concerning the issue as to Ageco's solvency, which was relevant to the claims passed upon by the Special Master in the CDC proceeding; and he also raised a question as to the legality of the transfer of Ageco's assets to Agecorp.

The problem now to be resolved is whether, notwithstanding these conclusions of the Special Master, the Plan should be modified, in view of the opinion of the Appellate Court in the Elias case. I deem it appropriate to point out that the order of classification appealed from, did not purport to determine the rights of the holders of CDCs or of the "original holders" of COs and Preferred and Preference Stock, because they were to participate in the assets under the proposed Compromise. Representatives of these classes of securities were not parties to the proceedings in the Circuit Court of Appeals and did not have an opportunity to urge their arguments on certain aspects of the case upon which the Circuit Court did not have a complete record. It should be noted, in extenuation of any inadequacies of the record for which these parties might otherwise be chargeable, that the classification proceedings were had before the Special Master after the terms of the Compromise were published, and that these participating parties were not opposed to the Compromise. Only the nonparticipating security holders, listed in my order as such, took an appeal therefrom.

■ Turning now to an examination of the merits of the claims of the CDCs in the light of the Circuit Court's opinion, it is clear that I must reject the Special Master's Conclusion of Law 9(a), which reads:

"Doubt exists * * *:

"(a) Whether Ageco's option to convert the CDCs into stock was a valid provision;"

That is a conclusion based upon unchallenged Findings of Fact relating principally to written documents. The opinion of the Circuit Court that the Ageco option to

convert the CDCs into stock was a valid and enforceable provision of the Certificate, must therefore be accepted as controlling.

But there remains the question whether the option was validly exercised, and this is an exceedingly complex question which may be subdivided into the following issues of fact and law as summarized in a supplemental brief filed with me by the Trustees of Ageco and Agecorp, after the Circuit Court of Appeal's decision in the Elias case:

"(1) Were the preferred stock dividends paid in 1932 illegal dividends in the sense that they were not paid out of surplus?

"(2) If they were illegal dividends, but had been declared by the board of directors 'in good faith', could Ageco nevertheless exercise the option to convert CDCs into stock?

"(3) Did the board of directors declare the dividends 'in good faith'?

"(4) Had Ageco transferred substantially all its assets to Agecorp prior to June 15, 1932, the effective date of the conversion of CDCs?"

Accepting the opinion of the Circuit Court as controlling on the first two of these issues, it is to be noted that as to the latter two issues the Circuit Court, as its opinion indicates, had a greatly abbreviated record. This does not furnish a basis of further challenge to the appellants in Elias v. Clarke, but it should be considered in connection with a determination of the rights of those who did not participate in the appellate proceedings.

My contract with these proceedings satisfies me that the proof of the good faith of the directors of Ageco holding office in 1932, is a not inconsiderable burden; I need say no more than that concerning issue (3) quoted above. For reasons I have stated elsewhere in this opinion I have concluded that the question as to whether or not there was a transfer of substantially all of Ageco's assets in March of 1932, should be answered in the affirmative. Accordingly, I believe that there is sufficient probability that the CDCs may establish the invalidity of Ageco's exercise of the option to convert the CDCs into stock, to justify some participation for them under the terms of a compromise. And since the COs and Preferred and Preference stock (in the hands of "original holders") claim derivatively as it were, through the CDCs, a

basis for their participation is also afforded.

Only 2% of the common stock of the surviving company is to be issued to the holders of an estimated $25,500,000 principal amount of these claims. (The unpaid interest and dividends on these claims represent additionally about 70% of principal amount.) To each $100 principal amount of CDCs there is allotted 1.03 shares of common stock; to a $100 CO, .51 shares; and to a $100 liquidation value of preferred or preference stock there will be issued .51 shares of new common stock. Accepting for present purposes a valuation of the combined estates of $105,000,000, the distribution to these classes represents an allotment of only $13.50 to a $100 par CDC; $6.75 to a $100 par CO; and $6.75 to each $100 liquidation value Preferred and Preference stock. Having in mind the magnitude of the total claims against these estates, the distribution to be made to the CDCs, COs and Preferred and Preference stock should not be further diminished.

The Propriety of Excluding the IB and NIB Scrip from Participation.

Claims upon the Interest Bearing (IB) and Non-Interest Bearing (NIB) Scrip, of which approximately $10,000,000 is outstanding, have been classified as subordinate to the general creditors of Ageco, and since it is apparent that there is an insufficiency of assets to satisfy the general creditors, it would seem to follow that no distribution may be made upon the Scrip. Case v. Los Angeles Lumber Products Co., supra; Consolidated Rock Products Co. v. DuBois, supra.

It has been urged upon the Court, however, that the opinion of the Circuit Court of Appeals in Elias v. Clarke requires some other result, at least with respect to the Scrip in the hands of persons who were "original holders" of COs and received the Scrip as interest on such COs. This contention is predicated primarily upon the last paragraph of the opinion, and has two branches.

It is argued, in the first place, that the Circuit Court has indicated that the holder of Scrip, even though he has parted with his CO, may have a fraud claim entitled to recognition, on the same theory upon which the COs are recognized. In the second place it is urged that the Original Holder of a CO who has retained his

Scrip is entitled to a greater measure of participation than an original holder of the CO alone.

As to the first argument, I think it clear that since the Circuit Court has sustained the classification of the Scrip as subordinate, it meant to say no more, so far as the Scrip holder is concerned, than that the measure of his recovery upon a fraud claim—based upon the conversion of the CDCs into COs—would vary depending upon whether and to what extent he had retained his Scrip.

I believe that the second branch of the argument is falsely premised. The Circuit Court did not say that the CO holder with Scrip was entitled to more than the CO holder without Scrip; it merely indicated that consideration should have been given to this problem in connection with the compromise. The record before me shows clearly that consideration was given by the trustees—both before and after the opinion was handed down in Elias v. Clarke —to the question whether participation of an "original holder" of COs should vary in amount in accordance with the amount of Scrip issued as interest thereon which was still held. It was the conclusion of the trustees that no such differentiation was required, and I do not believe this conclusion erroneous or in conflict with the opinion in Elias v. Clarke. The Scrip as such is a worthless security and it would have been a futile requirement, administratively onerous, to condition participation in the Plan by the "original holder" of a CO upon his surrender of Scrip. Moreover, the treatment accorded to the original holder of COs was deemed by the trustees, and is so found by me, to be fully compensatory of all of the rights of such a holder, even if he does retain all of the Scrip originally issued.to him. This conclusion is reinforced, of course, by the decision and comments of the Circuit Court of Appeals in Elias v. Clarke. The only question that remains is whether it is unfairly discriminatory, among the members of the class of "original holders" of COs to make no differentiation between them upon the basis of the amount of Scrip still individually held. Having in mind 'the small distribution upon the claims of original holders of COs, percentage-wise, and the onerous and expensive administrative procedure which would be necessary to effect a distribution upon the COs, adjusted to reflect the Scrip received thereon and still held, I conclude that the Compromise and Plan do not unfairly discriminate among holders of COs. I might add that it would not be for the Scrip holder, as such, to complain of the Plan in this regard, but rather for the holder of COs who holds also Scrip.

I believe that the mandate of the Circuit Court as it relates to these provisions, has been fulfilled, and for the reasons stated, I find the Compromise to be fair and equitable in providing participation for the CDCs, COs and Preferred and Preference Stocks, and in excluding from participation the IB and NIB Scrip.

Mr. Sparta Fritz, a security analyst (and a creditor of Agecorp) appeared pro se in opposition to the Plan. He had not theretofore appeared in the proceedings before the Court or the Special Master, and his objections to the Plan are unrelated to the Compromise—which he stated should be approved. Mr. Fritz had appeared before the Securities and Exchange Commission to urge a modification of the capital structure of the new company. He filed his protests with the Commission in the form of an amendment to the Plan and his proposal was rejected by the Commission as "fantastic." In my own opinion Mr. Fritz's amendment is without merit. Indeed it would seriously affect the feasibility of the Plan. He does not suggest any real necessity for any modification of the capital structure of the surviving company, but he claims his amendment would save taxes. The debt structure he would impose on the surviving company would be contrary to the requirement for a sound financial policy in all reorganized public utility holding companies. Public policy demands at least that the objectives of that policy should not be brushed aside in an effort to avoid taxes.

### In Conclusion.

It is unfortunate that the value of the combined assets of Ageco and Agecorp is such that many classes of Ageco security holders do not share in the assets of the surviving company under the Plan of Reorganization. The Special Master found that the assets are worth less than $125,000,000. In my opinion they are worth at least $105,000,000 but somewhat less than $115,000,000. This valuation is in excess of the range of values found by the Securities and Exchange Commission, but is not incompatible with the Commission's finding, in view of the additional period considered by the Court and certain fa-

vorable developments during that period. The total face value of the outstanding Agccorp 8s of 40, and 78s, and the Agecorp 73s at twice their face value, plus the Ageco FIDs and SFIDs, is about $258,-500,000, a sum which is more than twice the high figure of the Special Master. Under the circumstances here present, it is not necessary that the Court make a precise valuation of every asset in order to make a finding that the excluded securities and stock of Ageco have no value. The United States Supreme Court has so held and has laid down the rule that "the basic question in a valuation for reorganization purposes is how much the enterprise in all probability can earn." Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523 at page 540, 63 S. Ct. 727, at page 738, 87 L.Ed. 959. It is on that basis that the Ageco and Agecorp assets have been valued.

It may be expected that attorneys representing rival claimants to specific assets will strive in entire good faith to win every point in every court in an effort to get the best possible results for their clients. Although the attorneys for the Committees of 73s and 78s, and their indenture trustees oppose the compromise many large holders of 73s and 78s have expressed their approval. See opinion of Securities and Exchange Commission. Attorneys are advocates and litigation is their field, but litigation takes time and money.

■ It is the duty of the Court to be mindful of the very purpose of a compromise. As Judge Swan expressed it in the Prudence Co. case, 98 F.2d 559 at page 560: "The very purpose of a compromise is to avoid the determination of sharply contested and dubious issues." The approval of the compromise, in the first instance, rests in the sound discretion of the Court. In the exercise of that discretion I have considered the issues of fact and law involved in the Recap Litigation and related issues of the CDC proceeding, the uncertainty of the results of the litigations, and just how substantial the element of uncertainty is. The Recap Litigation has been long, complicated and expensive, with tremendous sums and the rights of a hundred thousand security holders dependent upon its outcome. In passing upon the fairness of a compromise the Court considers "what was reasonably to be expected to happen had no agreement been made." Judge Chase, In re Riggi Bros. Co., 2 Cir., 42 F.2d 174 at page 176.

■ When the proposal for the compromise of the Recap Litigation and certain parts of the CDC litigation was before the Court and referred to the Special Master, no question was raised as to the power of the Court to consider the compromise. Nor was any such issue presented to the Special Master. The rights of certain classes of security holders, their claimed priorities or subordinate burdens, can be adjudicated by a bankruptcy court in the exercise of its equitable powers. The Compromise would settle all the controversies of the Recap Litigation, as well as the issues of the CDC litigation relating to holders of CDCs and original holders of COs and Preferred and Preference Stock. The approval of the compromise seems to me to come within the provisions of § 27 of the Bankruptcy Act, 11 U.S.C.A. § 50, and Rule 23, Federal Rules of Civil Procedure. However, the Supreme Court has held that conflicting claims to specific assets of a debtor in the possession of the Court may be compromised through the medium of a plan for the reorganization of the debtor. Case v. Los Angeles Lumber Products Co., supra.

■ The joint Plan of Reorganization of Ageco and Agecorp is built upon the compromise. "Compromises, settlements, and concessions are a normal part of the reorganization process." Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., supra, 318 U.S. at page 565, 63 S.Ct. at page 749, 87 L.Ed. 959. The compromise and the plan should be approved as fair, if after a careful study of the facts and the law, honest doubt exists as to the rights of various classes of claimants, and if the compromise gives appropriate recognition to the range of alternative probable results of the litigation. As hereinabove indicated, I believe that many of those doubts on fundamental issues would be resolved in favor of the Ageco FIDs.

The probable outcome of the Recap Litigation is foreshadowed in the following quotation from the Special Master's opinion:

"Sufficient has been stated or outlined by me to present the issues which must be decided by the Special Master and the courts as to the priority of the Agecorp issues of '73 and '78 over the debenture bonds of Ageco. As I have before stated, the fair thing seems to be to set aside the Recap Plan and, if legally possible, restore the '73s and '78s to their original position as Ageco debenture holders, or, in

other words, place them on a parity as to the assets with the Ageco bonds, taking into consideration, of course, adjustments required by circumstances. I am not deciding the matter because of the proposed compromise. In determining whether or not this settlement plan is fair I must take into consideration the possibility, even the likelihood, that in determining the issues in the Recap litigation the courts will brush aside priorities and order parity in distribution, making adjustments as to it seems equitable, and very likely not allowing the '73s and '78s the interest increase which is afforded by the compromise plan.

\* \* \* \* \*

"When we come to a settlement of a litigation as protracted, complex and involved as this, we take into consideration the probable outcome of the case. I have already discussed this and, in my judgment, it is very doubtful indeed whether '73s or '78s could maintain their priority, and if a court attempted to restore them to their original position many things might be taken into account, such as the cost of the Recap Plan, which would reduce materially the amount of their claims. Secondly, there is the question of collection, for the assets are shrinking every day, according to the statements made to me on the hearing. No one expects cash payment of even their proportional part—other securities are in the offing. The assets were assumed in the questions asked to be from $80,000,000 up to $125,000,000 and the expenses of litigation are rising every day that this problem is unsolved."

As to the settlement of certain claims of the CDC litigation the Special Master expressed the following views:

"As to the CDCs and COs, I shall refer to my report, heretofore submitted to the Court. In this report it will be recalled I decided that the CDCs and the COs did not share in the assets on a parity with the debenture holders. The CDCs had taken their securities subject to the right of election upon the part of the Company to convert into stock, and I decided that this conversion had taken place. However, knowing of this purported proposal for settlement, I thought it fair to state my doubts as to my own findings. I said, and still repeat, that a strong argument could be made that these CDCs had not been converted and that the attempt to convert them was aborted. Exercising my best judgment on a question of fact I, however, decided that they had been converted. I gave my rea-

sons. Here, again, a question of fact may reasonably be decided either way. Litigation, expense, long drawn-out litigation might find the CDCs still debts of the Ageco, standing on a parity with other obligations; and what would be the gain or loss when finally the question was settled? To give these two classes of securities that which has been proposed is reasonable and to the best interests of all concerned."

I have before me the recommendation of the learned Special Master, the Hon. Frederick E. Crane, who for many years was a member of the New York Court of Appeals and for part of that time was its Chief Judge. He heard the evidence in the Recap Litigation and in the CDC proceeding, and he has considered the arguments of counsel therein. He also heard the evidence on the terms of the proposed compromise of the rival claims of the various classes of security holders to the properties of Ageco which are now held by Agecorp. After weighing it all he has recommended that the compromise be approved. His findings of fact and conclusions of law are explained and supported in an able opinion. There is no question about the Special Master's fairness, his outstanding ability or the thoroughness with which he has reviewed the facts and the law. Judge Crane undertook this work largely as a public service and at the request of the Court. All of the counsel commend his work, although some of them do not agree with the conclusions he reached. He has made a most careful analysis of the factual basis of the claims of the various classes of security holders and he has clearly stated the legal principles on which those claims would be judicially determined. His views on the probable outcome of the litigation as to some issues, and its uncertainty as to others, rest upon an informed judgment and carry great weight. He believes that the Compromise is fair and equitable.

The joint Plan of Reorganization of Ageco and Agecorp gives effect to the Compromise of the Recap Litigation and of certain claims involved in the CDC proceedings. The Plan has been considered by the members of the Securities and Exchange Commission. The technical and legal staffs of the Commission have had an opportunity to study the provisions of the Plan. The counsel for the Committees and the attorneys for the Trustees argued all of the issues before the entire Commission. Although the Commission did not formally pass upon the Compromise, in effect it did

so in reaching its conclusions upon the Plan of Reorganization. The decision of the members of the Commission was unanimous.

The Securities and Exchange Commission's conclusions as to the fairness of the joint Plan of Reorganization were stated as follows:

"H. Conclusions as to Fairness.

"On the basis of the claims, counterclaims and defenses outlined in the foregoing discussion we find:

"(1) That in giving priority of position to the 8's of '40 and in allocating new debentures and cash equivalent to 102.56% of principal plus interest on principal at a 4% rate to the effective date of the Plan, the Plan accords the 8's of '40 'the equitable equivalent of the rights surrendered' in view of existing doubt as to their right to realize the maximum amount of their claims.

"(2) That in allocating new common stock of the surviving company to the other Participating Securities and to general creditors of Agecorp and Ageco, on the premise that their claims are on a parity with each other (subject to adjustment as to amounts), the Plan has a sound and rational basis meeting the requirements of equity arising out of the confused situation in which the two debtors and their respective creditors have been placed by the actions of a common management prior to bankruptcy.

"(3) That the differentials among the various parity claims, as reflected in the allocations of new common stock provided for in the Plan, compensate each participating class and group in the light of its claims and litigation strength in relation to the claims and litigation strength of each other class and group, without exact measurement of each (which is impossible under the circumstances) but by practical adjustments which fall well within a permissible range of fairness and equity, having due regard to the benefits to be derived by all from the prompt termination of litigation.

"(4) That in excluding the non-participating securities of Ageco from participation in the reorganization, the Plan conforms with the absolute priorities doctrine applicable in bankruptcy cases, and excludes no class having an interest or a reasonable prospect of acquiring an interest in the assets or earnings of the debtor estates.

"(5) That the Plan, accordingly, is fair and equitable to the persons affected."

When both the Compromise and the Plan finally came before this Court for consideration, all the attorneys were permitted to file printed briefs in advance of their arguments. The briefs totalled over a thousand pages. The formal arguments of counsel on the points presented in their briefs took 26 hours. The court hearings devoted to the taking of testimony constitute a typewritten record of about 2000 pages. In addition over 70 exhibits were received or offered in evidence—many of them consisting of extensive schedules and estimates.

Everyone who has had occasion to study the many issues of the Recap Litigation has agreed that it should be settled, instead of dragging its cumbersome bulk through the courts in protracted litigation—and at great expense. The lawyers for all the Committees are in agreement that there should be a compromise, but they disagree on what constitutes a fair and equitable settlement of the litigation. The proposed compromise of the litigation has made it possible to work out a joint Plan of Reorganization for both Ageco and Agecorp and thus bring to a close these bankruptcy proceedings. If the Plan of Reorganization is accepted and confirmed before the end of the year a large claim for Federal taxes can be settled on favorable terms. All the expense of the Recap Litigation and the bankruptcy proceedings will be ended. The Ageco and Agecorp security holders entitled to share under the terms of the Compromise and the Plan will receive shares of common stock that will be listed on the Exchange and that should pay dividends. In the exercise of what I believe is a sound discretion, I approve the Compromise as fair and equitable, on the condition however that a joint Plan for the Reorganization of Ageco and Agecorp, based substantially on the Compromise, is both approved by the Courts and accepted by the security holders entitled to participate under the Plan. I reserve jurisdiction over the Compromise pending the results of further action on the Plan.

Likewise I approve the joint Plan of Reorganization for Ageco and Agecorp reserving jurisdiction "to pass upon all future amendments to said plan, including (without limitation) certain necessary amendments with respect to the surviving company's new senior debt and new debentures, and the number of directors and the persons to be named as members of its initial board of directors; and in general to conduct all further proceedings that

may properly be brought * * * in respect of the plan, the consummation thereof, and the transaction incidental thereto." The above quoted reservation is the same as the reservation contained in the paragraph numbered (3) of the order of the Securities and Exchange Commission, dated April 14, 1944, approving the Plan.

I intend to recommend the Plan of Reorganization to the participating security holders for their acceptance. In my opinion no one group of security holders could really gain anything by continuing the Recap Litigation, that would be at all comparable with the advantages of the Compromise. Judge Crane in the opinion he filed with his report on the proposed Compromise said: "Adjustment and reorganization should follow as speedily as possible for the benefit of all creditors. * * * The complaints which are made of unfairness are simply those which arise at all times when any compromise is suggested; no one thinks he is getting his share. Some losses must be sustained. Experience teaches that a man cannot always get what he wants and by rigidity loses what he might have had."

There should be an end to all the litigation and to these bankruptcy proceedings. The security holders entitled to share in the assets under the Plan of Reorganization should get their properties out of the Courts and manage them as private enterprises, free from the supervision of the Courts. The first steps in that direction have been taken by the Securities and Exchange Commission and by this Court. If the security holders accept the Plan of Reorganization the goal will be reached. I hope that they will do so.